## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC., | ) ) ) | No. 16 CV 11390 |
| Plaintiff, | ) ) | |
| v. | ) ) | Magistrate Judge Young B. Kim |
| HUTTIG BUILDING PRODUCTS, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC., | ) ) | No. 16 CV 11468 |
| Plaintiff, | ) ) | |
| v. | ) ) | Magistrate Judge Young B. Kim |
| SCOTT FELTEN, et al., | ) ) | |
| Defendants. | ) ) | December 9, 2017 |

### MEMORANDUM OPINION and ORDER

Before the court are PrimeSource Building Products, Inc.'s ("PrimeSource")

motions for preliminary injunction in these two related cases against Huttig

Building Products, Inc. ("Huttig") and several of PrimeSource's former employees

who currently work for Huttig. PrimeSource seeks what it refers to as a

"production injunction," which would shut down the operation of an entire Huttig

division, known as the Huttig-Grip Division, pending a final trial on the merits.

Alternatively, it seeks to enjoin Huttig from selling building products to certain

customers and to prevent certain Huttig employees from working for either Huttig

or the Huttig-Grip Division. The parties have consented to this court's jurisdiction for the limited purpose of resolving the preliminary injunction motions. For the following reasons, PrimeSource's motion for a preliminary injunction in case No. 16 CV 11390 is denied, (R. 23), and its motion for a preliminary injunction in case No. 16 CV 11468, (R. 26), is granted in part and denied in part:

## Procedural History

PrimeSource initiated these related actions within four days of each other in December 2016. On December 15, 2016, PrimeSource sued Huttig along with four former PrimeSource CEOs who currently work in the Huttig-Grip Division: Kenneth Fishbein, Mona Zinman, David Fishbein, and Robert Furio (collectively, "the CEO Defendants"). PrimeSource alleges that the CEO Defendants violated the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836-39, and several covenants in their employment agreements with PrimeSource when they went to work for Huttig. (Case No. 16 CV 11390, R. 1, Compl. ¶¶ 68-119.) A month later PrimeSource amended its complaint to include a claim under the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq*. (Case No. 16 CV 11390, R. 18, Am. Compl. ¶¶ 66-67.) On December 19, 2016, PrimeSource sued Huttig along with former PrimeSource employees Scott Felten, Garrett Kessler, Daniel Kottmeyer, Allan Sagunsky, and Jordan Whitehead (collectively, "the Felten Defendants"), alleging that they violated the DTSA, the ITSA, and several restrictive covenants from their employment agreements with PrimeSource when they took jobs working with the CEO Defendants in the Huttig-Grip Division. (Case No. 16 CV 11468, R. 1, Compl.

¶¶ 78-116.)  In both cases PrimeSource also alleges that Huttig tortiously interfered with its employment contracts with the individual defendants.  (Case No. 16 CV 11390, R. 18, Am. Compl. ¶¶ 100-04; Case No. 16 CV 11468, R. 18, Am. Compl. ¶¶ 123-129.)

On January 19, 2017, PrimeSource filed the current motion for preliminary injunction in its case against Huttig and the CEO Defendants.  (Case No. 16 CV 11390, R. 23.)  That same day, PrimeSource moved for a temporary restraining order (and after an evidentiary hearing, a preliminary injunction) against Huttig and the Felten Defendants.  (Case No. 16 CV 11468, R. 26.)  Following a hearing and briefing, on March 3, 2017, the court granted the TRO motion in part, temporarily restraining the Felten Defendants and Huttig from using PrimeSource materials in their possession, from soliciting certain customers, and from selling certain products or services.  (Case No. 16 CV 11468, R. 41, TRO at 1.)  The court twice amended the TRO in the six weeks that followed, (Case No. 16 CV 11468, R. 52, Am. TRO at 1; R. 78 at 1), with the third and current iteration specifying that:

> a.     Defendants Scott Felten, Garrett Kessler, Daniel Kottmeyer, and Allan Sagunsky are prohibited from soliciting any PrimeSource customers, either directly or indirectly, to whom they, individually as PrimeSource employees, sold products or services to during the past two calendar years, where those products or services are (i) competitive with PrimeSource's fasteners or are (ii) fasteners of a similar type, kind, or nature to those supplied or distributed by PrimeSource during their employment with PrimeSource.

(Case No. 16 CV 11468, R. 78, Am. TRO at 1.)  The current TRO further clarifies that:

b.     Defendant Huttig is not prohibited from soliciting customers to whom Defendants Felten Kessler, Kottmeyer, or Sagunsky, individually as PrimeSource employees, sold products or services to during the past two calendar years, provided that Defendants Felten, Kessler, Kottmeyer, and/or Sagunsky have no role, either directly or indirectly, in such solicitations by Huttig.  Huttig shall not solicit such customers using information provided to Huttig by Defendants Felten, Kessler, Kottmeyer, or Sagunsky.

(Id. at 1-2.)

In early April 2017 both cases were referred to this court for discovery supervision.  (Case No. 16 CV 11390, R. 51; Case No. 16 CV 11468, R. 63.)  The following month the referrals were expanded to include the motions to dismiss then pending in both cases and the motion for preliminary injunction pending in the case against the CEO Defendants.  (No. 16 CV 11390, R. 55; Case No. 16 CV 11468, R. 85.)  This court issued an order scheduling the evidentiary hearing for the preliminary injunction motions to begin on August 10, 2017.  (Case No. 16 CV 11390, R. 62; Case No. 16 CV 11468, R. 93.)

On July 6, 2017, this court issued memorandum reports and recommendations with respect to the two motions to dismiss.  In the case against Huttig and the CEO Defendants, the defendants sought to dismiss only the DTSA and the ITSA claims, arguing that PrimeSource failed to identify the relevant trade secrets with sufficient specificity.  This court recommended that this argument be rejected, noting that even general allegations regarding the identity of trade secrets are sufficient to pass muster at the Rule 12(b)(6) stage.  (Case No. 16 CV 11390, R. 72, Mem. Rep. & Rec. at 9.)  In the case against Huttig and the Felten Defendants, the defendants sought to dismiss all seven then-pending counts.  This

court recommended granting the motion only with respect to the then-pending conversion claim, and denying the motion with respect to the remaining claims. (Case No. 16 CV 11468, R. 105, Mem. Rep. & Rec. at 27.) In addressing the breach of contract claims, this court recommended a finding that Texas law applies to those claims under the terms of the Felten Defendants' respective employment agreements, (id. at 11), but recommended that the question of the enforceability of the agreements' covenants be resolved at a post-evidentiary stage in the litigation, (id. at 12).

Shortly after this court issued its reports and recommendations, PrimeSource amended its complaints in both cases, adding a defendant in the case against the Felten Defendants and dropping the conversion claim.[1] (Case No. 16 CV 11390, R. 75, 2d Am. Compl.; Case No. 16 CV 11468, R. 108, 2d Am. Compl. ¶¶ 75-89, 128-39.) On July 24, 2017, the parties consented to this court's jurisdiction to resolve the preliminary injunction motions. (Case No. 16 CV 11390, R. 95; Case No. 16 CV 11468, R. 130.) On August 3, 2017, this court's reports and recommendations with respect to the motions to dismiss were adopted. (Case No. 16 CV 11390, R. 107; Case No. 16 CV 11468, R. 141.)

Beginning on August 10, 2017, this court held a seven-day joint evidentiary hearing with respect to the preliminary injunction motions pending in both cases. Over the course of the hearing, the parties presented multiple witnesses and

---

[1] The court limits its analysis to the parties and claims addressed in the pending preliminary injunction motions, which predate the amended complaints. Any other analysis would fall outside the scope of the parties' limited consents.

hundreds of exhibits. Following the hearing, the parties submitted proposed findings of fact and conclusions of law. Although these cases have never been formally consolidated, the parties agreed to a single evidentiary hearing addressing both motions and filed in both cases identical, global post-hearing briefs covering both motions. Accordingly, and in the interest of efficiency, this court addresses both motions in this single opinion. Based on the testimony and evidence presented at the hearing, the following represents this court's findings of fact and conclusions of law:

## Findings of Fact

### A. PrimeSource, Huttig, and the Building Products Industry

PrimeSource is a building products company that derives a significant amount of revenue from the sale of fasteners. (Tr. 53, 56.) Fasteners are nails and screws that are used to join building products together in construction projects. (Tr. 54.) PrimeSource sells many of its products, including fasteners, under the brand name "Grip-Rite," which is a premium brand that PrimeSource has spent many years developing. (Tr. 412-14.) PrimeSource does not make any products itself, but rather functions as a distributor of building products and an intermediary between suppliers and customers. PrimeSource works with over 17,000 customers and 600 suppliers. (Tr. 473-74.)

Huttig is a publicly traded company that has been in the building products distribution business since 1885. (Tr. 314, 384.) Its core products include pre-fabricated doors, windows, and millwork. (Tr. 71, 1458.) Like PrimeSource, Huttig

6

is a building products distributor, meaning it buys and resells products used in the building industry rather than manufacturing products itself. (Tr. 71-72, 384-85.) Huttig has approximately 1,500 full-time employees and has historically worked with over 10,000 customers, including customers who also work with PrimeSource. (Tr. 246, 326, 385.) Before launching its Huttig-Grip Division in November 2016, Huttig distributed fasteners primarily in the Pacific Northwest region, but did not have a sales force specifically designated to fastener sales. (*See* Tr. 1458-59, 1475.)

As building products distributors, both Huttig and PrimeSource order and purchase fasteners and other products from suppliers (also known in the industry as "vendors" or "mills"), which are typically located overseas. Both companies then resell the products to customers, which are generally lumber yards or retailers like hardware stores. (*See* Tr. 58, 384.) Fasteners are pure commodity items, meaning they are produced according to standard, government-regulated specifications. (*See* Tr. 1326.) Accordingly, fastener suppliers will produce identical fasteners for competing building products distributors, including PrimeSource, Huttig, and many others. (Id.)

Both Huttig and PrimeSource employ standard one-step and two-step distribution models that are widely used by distributors in the building products industry. (*See* Tr. 68, 385-87, 420.) The one-step distribution model is known as "direct sales," and involves the distributor acting as a product broker arranging for shipment directly from the supplier to the customer. (Tr. 385-87.) Under the two-step model, the distributor buys products from the supplier, physically receives and

warehouses the goods, and then resells the products through the warehouse on an order-by-order basis. (*See* Tr. 386.) The warehouses used in the two-step model are also known as "distribution centers." Huttig currently has 27 distribution centers located throughout the United States, (id.), and PrimeSource has 34, (Tr. 64).

The building products industry is a concentrated one, and it is not unusual for professionals to work for a prior employer's competitor during the course of a career. (*See, e.g.,* Tr. 150, 153, 162.) For example, PrimeSource's current CEO, George Judd, previously worked as the COO and then the CEO of BlueLinx, a company that competes directly with PrimeSource's fastener-distribution business. (Tr. 51-52.) Judd has hired employees straight from PrimeSource competitors to work at PrimeSource, and he would hire someone from Huttig "if they were the right candidate." (Tr. 159.)

## B. The CEO Defendants and PrimeSource's 2015 Ownership Change

For a period leading up to the end of 2014, Kenneth Fishbein and Mona Zinman served as co-CEOs of PrimeSource. (Tr. 486, 1146-47, 1156-57.) Both are veteran building products professionals, with Zinman getting started in the industry when she was only 15 years old. (Tr. 1144-45, 1156.) In her role as co-CEO of PrimeSource, Zinman focused on import purchasing and logistics, which involved establishing and maintaining relationships with vendors and negotiating contract terms with those vendors. (Tr. 1146-60.) Zinman and Kenneth Fishbein retired as CEOs of PrimeSource on December 31, 2014, but stayed on in consulting roles for PrimeSource from January through May 2015. (Tr. 342, 1111, 1156-57.)

Zinman and Kenneth Fishbein both signed employment agreements while at PrimeSource that incorporated several restrictive covenants, including restrictions on post-employment solicitation, competition, and disclosure of confidential information. The non-solicitation and non-competition provisions of those agreements expired on November 8, 2016. (JX[2] 3; JX 4; JX 6; JX 7; Case No. 16 CV 11390, R. 148-1.) The provisions prohibiting the disclosure of PrimeSource's confidential information do not have an expiration date. (JX 3 ¶ 4.1.4; JX 6 ¶ 4.1.4.) Those provisions provide that Zinman and Kenneth Fishbein shall not, during or after their employment with PrimeSource, use or disclose to any third party confidential information, defined as:

> [I]nformation disclosed to or known by Executive as a consequence of or through [his or her] employment by PS concerning PS's or PS's client's business, operations, trade secrets, plans, products, processes, practices, or services including, without limitation, information relating to research, development, inventions, suppliers, customers, purchasing, accounting, finance, price lists, and marketing.

(JX 3 ¶ 4.1; JX 6 ¶ 4.1.)

Upon Kenneth Fishbein's and Zinman's retirements, David Fishbein (who is Kenneth's son) and Robert Furio took over as co-CEOs of PrimeSource on January 1, 2015. (Tr. 698; JX 9; JX 11.) During David Fishbein's and Furio's tenure as co-CEOs, PrimeSource's owner at the time, Itochu International, Inc., was marketing PrimeSource for sale to private investment companies. (Tr. 1004; JX 2.) Furio and David Fishbein worked with PrimeSource's banker to produce various marketing

---

[2] As used in this opinion, "JX" refers to the parties' joint exhibits, "PX" refers to PrimeSource's exhibits, and "DX" refers to the defendants' exhibits.

and promotional materials to present to potential investors. (PX 10.) On the advice of its banker, PrimeSource included in one of those presentations a reference to its supplier base as its "secret sauce." (Tr. 1016, 1390.)

On May 8, 2015, a private equity firm Platinum Equity purchased PrimeSource. (Case No. 16 CV 11390, R. 18, Am. Compl. ¶ 38.) Platinum Equity changed some elements of PrimeSource's operations significantly and the company began a series of workforce reductions. (Tr. 449-50, 1405-06.) On August 15, 2015, Platinum Equity fired Furio and David Fishbein. (Tr. 1050-51.) Neither David Fishbein nor Furio took any documents with them when they left PrimeSource, on the same day they were fired. (Tr. 1107-08, 1413-14.)

On the day that Platinum Equity bought PrimeSource, David Fishbein and Furio signed Amended and Restated Employment Agreements, (JX 9; JX 11), and on September 24, 2015, just over a month after they were fired and stopped working at PrimeSource, they both signed separate Severance and Release of Claims Agreements, (JX 10; JX 12). Those agreements included post-employment covenants not to compete and non-solicitation covenants. The covenants restricted David Fishbein and Furio from entering the employment of, or rendering any services to, a material competitor of PrimeSource. (JX 9 ¶ 4; JX 10 ¶13; JX 11 ¶ 4; JX 12 ¶ 13.) The covenants also precluded the two from soliciting for employment or hiring any of PrimeSource's employees. (Id.) The non-competition and solicitation covenants lasted for 12 months and expired on September 16, 2016. (Id.)

The agreements also included covenants relating to the disclosure of confidential information. (Id. ¶ 4.1) Through those covenants David Fishbein and Furio agreed not to use, disseminate or disclose PrimeSource's confidential information, defined identically to the definition of confidential information set out in Zinman's and Kenneth Fishbein's non-disclosure covenants. (Id.) The non-disclosure covenants do not have an expiration date, and extend beyond the expiration of the CEO Defendants' employment at PrimeSource. (Id. ¶ 4.1.4.)

## C.    The Felten Defendants

The Felten Defendants all worked in sales, sales support, or purchasing roles at PrimeSource during David Fishbein's and Furio's tenure as co-CEOs. Four of the five Felten Defendants (Sagunsky being the exception) met David and Kenneth Fishbein while working as golf caddies at a local country club. Specifically, Felten, Kessler, Kottmeyer, and Whitehead all worked as golf caddies at a country club where the Fishbeins played golf, and got to know the Fishbeins while working in those jobs. (Tr. 484, 692-93, 791-92, 885.)

The Fishbeins helped Felten, Kessler, Kottmeyer, and Whitehead secure jobs at PrimeSource. Kenneth Fishbein helped Felten get a job at PrimeSource as an inside sales person. (JX 16; Tr. 694.) Felten later transitioned to a role as a territory manager covering Chicago's northwest suburbs, and in 2015 he moved into his last role at PrimeSource, which was in domestic purchasing. (Tr. 694, 759-60.) Kessler first met the Fishbeins when he was a 13-year-old caddy, and his first full-time job was in the major accounts department at PrimeSource. (Tr. 484-85.) After

serving in that role for a couple of years, Kessler moved to the direct sales department in early 2014, where he worked out of the Buffalo Grove office but serviced customers outside the area, primarily through phone and online contacts. (Tr. 485; 593-94.) Similarly, David Fishbein helped Kottmeyer get a job at PrimeSource as an inside sales representative, eventually moving to an outside sales representative job serving a small territory in Chicago's northern suburbs. (Tr. 791-94.) Whitehead met the Fishbeins as a 17-year-old caddy, and went to work at PrimeSource in a support capacity for inside salespeople. (Tr. 885, 914-15.) The fifth Felten defendant, Allan Sagunsky, never caddied for the Fishbeins but now considers David Fishbein to be a friend. (Tr. 685.) He worked in direct sales at PrimeSource until November 2016. (Tr. 430-31, 646.)

During their tenure at PrimeSource four of the five Felten Defendants— Felten, Kessler, Kottmeyer, and Sagunsky—signed employment agreements which included non-solicitation and non-competition covenants. Those covenants precluded the Felten Defendants from soliciting PrimeSource customers or working for PrimeSource competitors for 18 months after their PrimeSource employment ended. Specifically, the covenants provided that the employees would not:

> [W]ithin a three-hundred (300) mile radius of any (a) distribution center of PrimeSource to which Employee has reported at any time during his or her employment with PrimeSource or (b) sales territory which has been serviced by Employee at any time during his or her employment with PrimeSource:
>
> • Sell or offer for sale any products or services of the type sold or offered by PrimeSource to any customer to whom PrimeSource sold products or provided services or any prospect PrimeSource solicited for business during the two most recently complete calendar years;

- Enter the employ of, or render any services to, any person, firm or business that is engaged in any business competitive with that of PrimeSource, including but not limited to the business of wholesale distributing or selling packaged or bulk nails or screws, collated tools or fasteners, roofing, gypsum, insulation, adhesives, wire products or any other building, building materials or related products and who has sold or offered for sale such products or services during the two most recently completed calendar years[.]

(JX 13 ¶ IV; JX 14 ¶ IV; JX 16 ¶ IV; JX 17 ¶ IV.)

All five of the Felten Defendants signed agreements including a covenant restricting disclosure of confidential information. Whitehead signed an agreement that explicitly states it "survive[s] any termination of this Agreement or of Employee's employment" and that defines confidential information as follows:

[A]ll non-public information regarding the (A) businesses, operations, finances and administration of the Company; (B) the systems, know-how and records, products, services, costs, inventions, computer software programs, marketing and sales techniques or programs, methods, methodologies, manuals, lists and other trade secrets heretofore or hereafter acquired, sold, developed, maintained or used by the Company, (C) the nature and terms of the Company's relationships with its customers, suppliers, lenders, underwriters, vendors, consultants, independent contractors, attorneys, accountants and employees; and (D) annual and monthly budgets, sales margins, compensation statements and all company reports including, but not limited to, the Sales Performance Detail Report, Reports of DC Sales by Salesman and Customer, Sale Type and Product Reports.

(JX 15 ¶¶ 1, 5.) The remaining Felten Defendants signed nondisclosure agreements that do not have an explicit termination date, and that define confidential information as:

[A]ll information not otherwise generally known to the public relating to each of (A) the financial condition, businesses and interests of PrimeSource, (B) the systems, know-how and records, products, services, costs, inventions, computer software programs, marketing

and sales techniques and programs, methods, methodologies, manuals, customer, price, and other lists, business plans and other trade secrets acquired or maintained by PrimeSource, and (C) the nature and terms of PrimeSource's relationships with its customers, suppliers, lenders, vendors, consultants and employees[.]

(JX 13 ¶ II; JX 14 ¶ II; JX 16 ¶ II; JX 17 ¶ II.)

## D. David Fishbein's and Furio's Post-PrimeSource Activities

In August 2015, after PrimeSource fired David Fishbein and Furio but before they signed severance agreements, the two had a conversation with Huttig CEO Jon Vrabely about the possibility of entering an arrangement whereby they would become employed by Huttig after their non-compete covenants expired.  (Tr. 1136-37, 1426, 1536.)  On December 9, 2015, both Fishbeins, Furio, and Huttig entered into what the parties refer to as the "Letter Agreement."  (JX 18.)  The Letter Agreement provided that upon the termination of their respective non-compete periods, David Fishbein and Furio would become employed by Huttig, and Kenneth Fishbein would work as a consultant to Huttig, to help the company expand its Huttig-Grip brand to a national scale.  (Id.; Tr. 383.)  Although during his hearing testimony David Fishbein characterized the agreement as just requiring him to "show up and go through this process of getting to know" Huttig upon the expiration of his non-compete, (Tr. 1429), attached as exhibits to the signed Letter Agreement were proposed employment and consulting agreements, including salary terms. (JX 18, Exs. A and B.)  The Letter Agreement also included a one-million dollar break-up fee, meaning that if Furio, the Fishbeins, or Huttig failed to execute the

employment or consulting agreements, the non-signing party would pay one million dollars to the other.  (Tr. 1438.)

After David Fishbein signed the Letter Agreement and before his PrimeSource non-solicitation agreement expired, he kept in touch to some extent with the Felten Defendants and the other CEO Defendants.  David Fishbein exchanged a string of text messages with Kessler, some of which were explicitly work related.  For example, in December 2015 he asked Kessler to provide him information about Kessler's non-compete agreement and Kessler complied, and in January 2016 he asked Kessler about his compensation at PrimeSource.  (Tr. 496-97, 499-501.)  Other contacts with Kessler and other Felten Defendants were in no way explicitly work-related, involving, for example, birthday greetings or invitations to golf.  (Tr. 649, 1448-49.)  In August 2016 the CEO Defendants had dinner together, and the Fishbeins and Furio told Zinman that they were "thinking about something."  (Tr. 1460.)  They asked Zinman generally if she was thinking about going back into the building products industry.  (Tr. 1165.)  At the time Zinman did not know that the Fishbeins and Furio had entered into a Letter Agreement with Huttig.  (Tr. 1168-69.)

On September 16, 2016, the non-solicitation and non-compete covenants that David Fishbein and Furio had signed with PrimeSource expired.  (JX 9 ¶ 4.2; JX 10 ¶ 13; JX 11 ¶ 4.2; JX 12 ¶ 13.)  Three days later they entered into consulting agreements with Huttig that were to last through November 18, 2016, allowing them to work on developing the Huttig-Grip division as independent contractors.

(JX 19; JX 20.) Shortly thereafter David Fishbein contacted Kessler to ask about his non-compete agreement, (Tr. 514-15), and in October 2016, he contacted Whitehead letting him know that a new job opportunity might soon exist, and asking him to spread the word to some of the other Felten Defendants, (Tr. 896-97).

During the period of their consulting arrangement with Huttig, David Fishbein and Furio met with Vrabely and Huttig's CFO to develop a tactical plan for the launch of the Huttig-Grip Division. (Tr. 1047-48.) The three of them worked with between 30 and 50 people, mostly existing Huttig employees, to develop a plan as to whether it was viable to expand the Huttig fastener business through the Huttig-Grip Division. (Tr. 280-81, 383, 1128-29.) By October 2016 they had created a tactical plan complete with tasks and task assignments. (Tr. 295; JX 45.) One of the tasks listed there described cross-referencing Huttig customers with prior customers and vendors from memory. (JX 45 at 2.) Furio was assigned a task related to distribution center layouts and integrating new products into the distribution centers. (Id.) That task included developing layout for warehouse racking. (Id.) The tactical plan included a reference to Zinman, even though at the time she was still bound by her non-compete agreement. (JX 45 at 5.) The tactical plan also included a reference to "The Huttig Club," which was a customer recognition event similar to one of PrimeSource's signature events, called "Premier Club." (Id. at 4; Tr. 1090.) David Fishbein and Furio were also involved in budget development and determining the financial impact of the Huttig-Grip Division, including developing job positions and salaries. (PX 300 at 2, 40, 49.)

The tactical plan was presented to the Huttig Board of Directors and approved on October 25, 2016. Leading up to that presentation, the team assigned to developing the tactical plan expended at least 1,000 working hours in determining whether the Huttig-Grip product line expansion was feasible. (Tr. 396-97, 1128.)

On November 8, 2016, Kenneth Fishbein's and Zinman's non-compete agreements with PrimeSource expired. (JX 3 ¶ 4.2; JX 4 ¶ 4.1; JX 6 ¶ 4.2; JX 7, ¶ 4.1.) On November 14, 2016, David Fishbein and Furio signed employment agreements with Huttig and Kenneth Fishbein and Zinman signed consulting agreements with Huttig. (JX 21; JX 22; JX 23; JX 24.) The following day, Huttig issued a press release announcing the launch of its new Huttig-Grip Division, which it described as "a new division to expand its private label construction fastener and specialty building products line." (JX 1.)

## E.     The Launch of the Huttig-Grip Division

Huttig's stated goal in launching the Huttig-Grip Division was to grow its revenues in the sale of fasteners within two to three years. (Tr. 335-39.) It intended to achieve that goal in part by procuring direct shipment sales, which are a good revenue generator because they do not require stocked inventory. (Tr. 68-69, 325-27, 1478.) Before launching Huttig-Grip, Huttig had sold fasteners through direct sales to a few customers, but among David Fishbein's duties in his new role at Huttig was to develop a sales plan to grow direct-shipment sales of fasteners. (Tr. 326, 362-63, 400-01.) Huttig also intends to increase its fastener sales by

selling products through its warehouses, and has added a large number of fastener stock keeping units ("SKUs") to its inventory following the Huttig-Grip launch. (Tr. 301, 303-04, 1097-98, 1488-89.)  Huttig is expanding its warehouses to increase its capacity to house the additional fasteners.  (Tr. 304-08.)  The Huttig-Grip Division is housed within a new office Huttig opened in Lincolnshire, Illinois, just a five-minute drive from PrimeSource's Buffalo Grove office.  (Tr. 297-98, 529.)

Huttig's November 15, 2016 press release included an announcement that the new division was hiring for positions nationwide, and included a link to an online job application.  (JX 1.)  The Felten Defendants all submitted applications through the online link.  (Tr. 364, 527, 653-54, 718, 904.)  Several of the Felten Defendants testified that they were dissatisfied with their jobs at PrimeSource after Platinum Equity's May 2015 acquisition, because that shift led to an underlying threat of layoffs and they were asked to do more work for the same compensation.  (*See* Tr. 794-96.)  After receiving the Felten Defendants' applications, Huttig asked, as part of its established hiring protocol, if they were subject to any employment restrictions stemming from their employment with PrimeSource.  (Tr. 1552-53.)  Only Sagunsky and Kessler realized that they had signed non-competes, and they provided copies of the agreements to David Fishbein, who forwarded the agreements to Huttig for legal review.  (Tr. 1552.)  Felten and Kottmeyer did not remember that they were subject to non-compete agreements with PrimeSource. (Tr. 1553-54.)

On November 17, 2016, two days after the Huttig-Grip press release, Felten, Kessler, and Sagunsky resigned from PrimeSource, (Tr. 486-87, 646, 757), and the next day, Kottmeyer and Whitehead resigned, (Tr. 859, 916). None of the Felten Defendants took any PrimeSource materials or documents with them when they left PrimeSource on the days of their resignations, or at any other time. (Tr. 618-19, 673, 764-65, 845, 917-18.) In fact, David Fishbein instructed the Felten Defendants not to take anything with them when they left PrimeSource. (*See, e.g.,* Tr. 619, 765, 845.)

Almost immediately upon their resignations from PrimeSource, the Felten Defendants went to work for the newly launched Huttig-Grip Division. Kottmeyer already had an offer letter from Huttig when he resigned from PrimeSource, and he started work with the Huttig-Grip Division on November 21, 2016. (JX 25.) Kottmeyer was hired as a building materials specialist in direct sales, but his position excludes the sale of fasteners. (Tr. 847, 849.) Felten, Kessler, and Sagunsky received their offer letters on November 21, 2016, and started the same day. (JX 26; JX 27; JX 28.) Felten was hired as an account executive selling fasteners on a direct basis and was ultimately assigned a territory including Florida, Mississippi, Alabama, Montana, North Dakota, and South Dakota. (Tr. 772-73.) Kessler was hired as a fastener specialist focused on direct sales of fasteners, and he was assigned to a territory designed not to overlap with the territories he had previously serviced at PrimeSource. (Tr. 622-24.) Sagunsky was hired in the Huttig Xpress Group, where his focus was to be on direct sales of

products.  (Tr. 646.)  He was assigned a territory that did not overlap with the territory he serviced at PrimeSource.  (Tr. 1552-53.)  Huttig gave Whitehead an offer letter on November 28, 2016, and he started work that same day.  (JX 29.) Whitehead's role at Huttig is as an account executive selling building materials on a direct basis.  (Id.; Tr. 914-15.)

## F.    The Felten Defendants' Huttig-Grip Activities

After moving to Huttig both Kottmeyer and Felten contacted customers they had serviced at PrimeSource.  Kottmeyer reached out to about five to ten of the customers he had serviced at PrimeSource, and Felten reached out to about three. (Tr. 739-40, 742-44, 813-14.)

When the Felten Defendants began working in the Huttig-Grip Division, they were given a three- to four-inch thick spreadsheet listing Huttig's then-existing customers and they began calling on those customers.  (Tr. 625-29.)  Because the list was so extensive, it became clear that they needed a better way to identify customers who would be interested in direct sales orders.  (Tr. 629.)  In an attempt to pinpoint customers that might be more open to direct sales of fasteners, David Fishbein instructed the Felten Defendants to use internet resources regarding roofing and drywall wholesalers to try to mine data that would be more valuable in targeting customers for direct sales.  (Tr. 1463-69.)  Another former PrimeSource executive working at Huttig, Sam Sprague, instructed Whitehead to include in his list customers he remembered servicing at PrimeSource.  (Tr. 911-12.)

In response to these requests, Kessler created a list which included 220 of his former PrimeSource customers. (PX 141; Tr. 538-41.) Kessler testified that he made the list from memory, using online resources to fill in information he could not remember. (Tr. 538-39.) Kessler's list included a reference to the PrimeSource branch that serviced each customer, along with customer contact information and some information about the products the customers purchased. (PX 141; Tr. 543-46.) One entry included a reference to a specific PrimeSource SKU number associated with the referenced product. (PX 141; Tr. 546-47.) In a column labeled "call notes," Kessler also included information about the customers' buying habits that he remembered from servicing the customers while at PrimeSource. (PX 141; Tr. 546.)

The customer lists created by the remaining Felten Defendants were somewhat less detailed. Sagunsky's list included 50-60 of his former PrimeSource customers, along with customer contact information that he either recalled or that he found on the internet. (Tr. 656.) The list also included some information he recalled about the customers' buying habits. (PX 160; Tr. 656.) Sagunsky testified that when he left PrimeSource he was given permission to transfer contacts from his PrimeSource cell phone to his personal phone, and those contacts included a handful of customer contacts. (Tr. 657-58.) He said that it is possible that one contact on the customer list he created while at Huttig came from the transferred contacts information. (Tr. 658.) Kottmeyer created a list that included about 40 of his former PrimeSource contacts, along with contact and product-purchasing

information.  (PX 138; Tr. 807-11.)  Felten created a list of about 25 PrimeSource customers, and Whitehead created a similar list.  (Tr. 739, 907-08.)

After the Felten Defendants created their lists, Felten took the new lists and added them to Huttig's database of pre-existing customers.  (Tr. 820-21.)  The Felten Defendants also exchanged the lists to divide up the contacts to ensure that none of them was directly contacting customers they had serviced while at PrimeSource.  (Tr. 689-90.)  They began calling on those customers, and Kessler made the Huttig-Grip Division's first sale to one of Sagunsky's former PrimeSource customers, who appeared on Sagunsky's customer lists.   (Tr. 563-68.)  In reaching out to each other's PrimeSource customers in December 2016 and March 2017, Kessler and Sagunsky referenced those customers' prior relationships with Kessler or Sagunsky in making their sales pitches.  (PX 170; PX 223; PX 223; Tr. 567, 669-70.)

## G.  **Zinman's Huttig-Grip Activities**

Zinman joined Huttig after a two-year retirement.  (Tr. 1162-63.)  On her first day on the job at Huttig, Zinman began contacting mills with which she remembered working during her years in the industry.  (Tr. 1235-37, 1239, 1263-64.)  She did not have a list of contact information, so she used internet resources, including an industry database called Panjiva, to find publicly available contact information for the mills she remembered.  (Tr. 1236-37, 1263-64.)  In her first few days at Huttig Zinman sent somewhere around 50 emails to various mills with a similar generic message introducing or re-introducing herself and referencing her

former position as CEO of PrimeSource. (Tr. 1267, 1270-71.) Those emails constituted a basic starting point from which Huttig would conduct due diligence to vet suppliers. (Tr. 1271, 1322-23; *see also*, *e.g.*, PX 70.)

It is not typical for mills in the building products industry to have exclusive contracts with any one distributor. (Tr. 1314-16, 1335-36.) That is because mills generally do not undertake a commitment to sell to only one importer distributor and instead book orders on a month-to-month or as-needed basis. (Tr. 1336.) Zinman testified that it is common for mills to tell distributors which other distributors they work with as a selling point, and that at a given time the same mill may be running production lines for the exact same product being made for multiple distributors. (Tr. 1315.) Many of the suppliers Zinman contacted while at Huttig also supply to PrimeSource and other competing distributors. (Tr. 1314-16.) Moreover, whether a given mill can be considered a "good quality" mill is something that can change over time, depending on whether the mill develops claim issues, goes through management changes, or experiences other quality-changing factors. (Tr. 1270-71.)

## Analysis and Conclusions of Law

PrimeSource asks this court to enter a production injunction in both of these related cases shutting down all operations in the Huttig-Grip Division during the pendency of this lawsuit. "A preliminary injunction is an extraordinary remedy and is never awarded as of right." *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016). Instead, it is up to the moving party to show that the preliminary injunction is

necessary to preserve the parties' respective positions until the case can be resolved on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Harlan v. Scholz*, 866 F.3d 754, 758 (7th Cir. 2017). Preliminary injunctive relief should be narrowly tailored to address the identified harm, and "[s]weeping relief is inappropriate if more focused restrictions will serve." *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 658 (7th Cir. 2006).

The court engages in a two-step analysis to determine whether preliminary injunctive relief is appropriate. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). First, it asks whether the moving party has demonstrated the following: (1) that it will suffer irreparable harm before the case can be resolved absent the requested relief; (2) that any remedies at law are inadequate to compensate it for that harm; and (3) that it has a reasonable likelihood of success on the merits of its claims. *Id.*; *see also Harlan*, 866 F.3d at 758. The moving party must demonstrate only that its likelihood of success is "better than negligible" to meet this threshold aspect of the test. *Rhoades*, 825 F.3d at 338. With respect to irreparable harm, however, the moving party must show that such harm is "likely," not just "possible." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Although to meet its burden here the moving party is not required to provide concrete proof of particular injuries, *see Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005), it must do more than speculate "about hypothetical future injuries," *see East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705-06 (7th Cir. 2005).

If the moving party meets these thresholds, in the second phase the court engages in a balancing test, weighing the harm in the absence of a preliminary injunction to the moving party against the harm of the requested injunction to the non-moving party, and asking whether the public interest outweighs the movant's. *Whitaker*, 858 F.3d at 1044. That balancing test incorporates a "subjective and intuitive" sliding scale approach, *see Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895-96 (7th Cir. 2001) (citation omitted), under which "the degree of likelihood of prevailing on the merits that the plaintiff must demonstrate decreases the more heavily the balance of harms weighs in its favor," and vice versa, *see Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986).

## A.    Irreparable Harm and Inadequate Remedy at Law

Taking the threshold elements in order, *see Harlan*, 866 F.3d at 758, the court looks first to PrimeSource's showing of irreparable harm. PrimeSource has shown a possibility of harm stemming from its trade secrets and breach of nondisclosure agreement claims. "Where trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable." *IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994). And because it is difficult to quantify precise losses associated with a former employee's decision to funnel trade secrets to its competitor, the harm associated with that kind of unfair competition is presumed to be irreparable. *See Intertek USA Inc. v. AmSpec, LLC*, No. 14 CV 6160, 2014 WL 4477933, at *6 (N.D. Ill. Sept. 11, 2014). Here, PrimeSource argues that the

defendants have used its confidential information and trade secrets to gain an unfair advantage in launching their division focused on the direct sales of fasteners and that they continue to use that information to compete unfairly in the direct sales market. Should PrimeSource prevail on those claims, the harm stemming from the misuse of its confidential and trade secrets information would be difficult to either pin down or quantify. *See Hess Newmark*, 415 F.3d at 632. Accordingly, PrimeSource meets the threshold irreparable harm showing with respect to its ITSA, DTSA, and breach of non-disclosure agreement claims.

PrimeSource's showing of irreparable harm with respect to its remaining breach of contract and tortious interference claims is more tenuous. When asked to describe PrimeSource's irreparable harm at the hearing, PrimeSource's CEO, George Judd, testified only that the former employees' transition to Huttig has led PrimeSource to have "numerous meetings, conversations" with suppliers who have "uncertainty and uncomfortableness," that it has caused "constant management" with current employees, and that he has to engage in "vast discussion" with customers about how this might change customer relationships going forward. (Tr. 94.) Judd said that his "fear" is that Huttig "will continue to take more business from PrimeSource; they'll continue to expand their relationships with our vendor partners; and they'll continue to shrink PrimeSource's revenues and gross margins." (Id.)

Although Judd's testimony about his "fear" of irreparable harm could be read to reflect the kind of speculation that falls below the threshold requirement, *see*

*East St. Louis*, 414 F.3d at 705-06, the fact that he testified that he fears a continuation of problems that he already is managing suggests that at some level there is a current and on-going harm from lost business. And given the evidence that customers rarely contract exclusively with one distributor in the building products industry, that lost business is likely to be harder to quantify than it would be in a case where the plaintiff could point to one or two specific customers whose business was diverted. In other words, the fluidity of the customer contracts and the competitive nature of those sales in the building products industry would make it difficult to identify which contracts or customers PrimeSource lost to Huttig as a result of the claimed misconduct. *See Hess Newmark*, 415 F.3d at 632 (noting that movant not required to specifically identify lost business to justify injunctive relief).

Moreover, the Seventh Circuit has described the injuries flowing from a violation of a non-compete agreement as "a canonical form of irreparable harm," because those injuries "are difficult to prove and quantify." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 666-67 (7th Cir. 2015). And although neither party points to this provision in their proposed findings, all of the relevant contracts include language stating that a breach of their respective covenants constitutes irreparable harm. That is a factor weighing in favor of an irreparable harm finding. *See Mickey's Linen v. Fischer*, No. 17 CV 2154, 2017 WL 3970593, at *19 (N.D. Ill. Sept. 8, 2017); *nClosures, Inc. v. Block & Co., Inc.*, No. 12 CV 9358, 2012 WL 1589654, at *2 (N.D. Ill. Jan. 15, 2013). Moreover, injunctive relief is "the best, and probably the only, adequate remedy" where the magnitude or existence of the injury

stemming from a violation of a restrictive covenant is difficult to discern. *Turnell*, 796 F.3d at 667. For all of these reasons, the court concludes that PrimeSource has passed the threshold for a showing of irreparable harm with respect to its breach of non-solicitation and non-competition covenants and its tortious interference claims, and that remedies at law are inadequate to address that harm. *See id.*

## B. Likelihood of Success

During the hearing in this case and through the post-hearing briefs it has become clear that PrimeSource's pursuit of a preliminary injunction is not premised in any way on its claims against Kenneth Fishbein or on its claims that the CEO Defendants violated their non-compete covenants. Instead, PrimeSource has tailored its request for injunctive relief to the following claims: (1) that David Fishbein and Furio violated their non-solicitation covenants; (2) that David Fishbein, Furio, and Zinman violated their non-disclosure covenants; (3) that the Felten Defendants violated their non-disclosure agreements and that Felten, Kessler, Kottmeyer, and Sagunsky violated their non-compete and non-solicitation agreements;[3] (4) that Huttig tortiously interfered with the Felten Defendants' PrimeSource agreements; and (5) that the Felten Defendants and David Fishbein, Furio, and Zinman have misappropriated and/or will inevitably continue to

---

[3] PrimeSource also asserts that it is entitled to relief based on what it argues was Samuel Sprague's violation of his employment agreements and Huttig's tortious interference with those agreements, but as explained in footnote 1, the court limits its analysis to the parties and claims addressed in the preliminary injunction motions pending before this court based on the parties' consent, which predate the amended complaints. Any other analysis would fall outside the scope of the parties' limited consents.

misappropriate PrimeSource's trade secrets.[4]  Accordingly, the court will focus on whether PrimeSource has made the requisite showing of a likelihood of success with respect to these categories of claims.

### 1.    The DTSA and ITSA Claims

At the heart of this litigation lies PrimeSource's concern that the defendants are disclosing or will inevitably disclose its trade secrets or confidential information to Huttig.  Accordingly, the court will begin by addressing its likelihood of success on its trade secrets claims.  PrimeSource argues that the CEO Defendants have misappropriated or will inevitably misappropriate trade secrets including supplier, marketing, budgeting, and inventory management information.  PrimeSource argues that the Felten Defendants misappropriated its trade secrets by recording and sharing information about its customers, including contact information and buying preferences.  Huttig argues that PrimeSource will be unable to show that any of this information rises to the level of a trade secret.

"To prevail on a claim for misappropriation of a trade secret under the [ITSA], the plaintiff must demonstrate that the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business."  *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003).  Similarly, the DTSA allows the owner of a misappropriated trade secret to seek relief where "the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."   18 U.S.C. § 1836(b)(1);

---

[4] For the remainder of this opinion, in the interest of efficiency, the court will refer to David Fishbein as "Fishbein."

*Mickey's Linen*, 2017 WL 3970593, at *8.  Both statutes allow for injunctive relief to prevent "threatened misappropriation" as well as actual misappropriation.  18 U.S.C. § 1836(b)(3); 765 ILCS 1065/3(a).

The DTSA defines trade secrets to include: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," where the trade secrets owner "has taken reasonable measures to keep such information secret" and where the information derives economic value from its secrecy.  18 U.S.C. § 1839(3).  The ITSA also focuses "fundamentally on the secrecy of the information sought to be protected," *see Learning Curve Toys,* 342 F.3d at 721, and defines a trade secret as "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers," 765 ILCS 1065/2(d).  To establish a protectable trade secret under either statute, the party seeking protection must show that the information: "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."  765 ILCS 1065/2(d); *see also* 18 U.S.C. § 1839(3).  In analyzing whether a purported trade secret meets these requirements, Illinois courts look to the following six factors: "(1) the extent to which the information is

known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Learning Curve Toys*, 342 F.3d at 722.

### a.    Trade Secrets Claims Against Zinman

In its opening post-hearing brief, PrimeSource argues that its "supplier lists" constitute trade secrets and that Zinman misappropriated those trade secrets when, on the first day of her employment at Huttig and thereafter, she "reached out to the supplier contacts she had established at PrimeSource in an attempt to utilize those contacts to supply product to Huttig." (R. 152, Pl.'s Mem. at 68.[5])  In its reply brief, PrimeSource expands considerably on those assertions, clarifying that it is not simply the identity of its suppliers that are subject to trade secret protection, but also information regarding "the quality, reliability, product specifications, contract terms and costs related to those suppliers." (R. 155, Pl.'s Reply at 28.)

After carefully considering the evidence presented at the hearing, the court concludes that PrimeSource is unlikely to establish that the supplier information it cites is entitled to trade-secret protection, and accordingly, its likelihood of prevailing on its trade secrets claims against Zinman is low.  In asserting that the

---

[5]  In the interest of efficiency, all references to the record from this point forward are to the records in Case No. 16 CV 11390 unless noted otherwise.

identity of its suppliers amounts to a trade secret, PrimeSource notes that the ITSA includes supplier lists in its definition of trade secrets and that several courts have found supplier information to be protectable as trade secrets. (R. 152, Pl.'s Mem. at 68.) But just because supplier lists are included in the ITSA definition of the kinds of information that *can* constitute trade secrets does not mean that *every* supplier list is protectable as a trade secret. Whether information is a trade secret hinges on its secrecy, *Learning Curve Toys,* 342 F.3d at 721, and obviously unless the owner takes steps to establish and maintain its secrecy, a supplier's identity does not amount to a trade secret.

Here, the hearing evidence shows that the identity of PrimeSource's suppliers is publicly available through customs reports and industry resources known as Panjiva and Import Genius. (Tr. 1115-17, 1236.) Those resources allow subscribers to identify not just the identity of PrimeSource's suppliers, but shipping details and generic descriptions of the products sourced from the vendor. There was testimony establishing that customers regularly identify suppliers to middleman distributors, (Tr. 1250), and that the suppliers themselves freely share information about who they are supplying as a way to market themselves, (Tr. 1315). Even PrimeSource's CEO admitted that the identity of PrimeSource's suppliers is not even confidential, let alone a trade secret. (Tr. 119.) And as for specific supplier contact information, Zinman credibly testified that with the exception of one email address she remembered, she used Panjiva and other public resources to track down contact

information for each supplier she contacted after her employment at Huttig began. (Tr. 1239.)

Engaging with the relevant trade secret factors, it is clear that neither the identity of the suppliers nor the contact information Zinman used in reaching out to those suppliers amounts to a PrimeSource trade secret. For example, given the testimony that supplier identities and supplier contacts are publicly available through internet resources, it is clear that information is known outside of PrimeSource's business. Zinman testified that competing distributors can visit product mills and see the products they are making for various distributors all at the same time. (Tr. 1315.) PrimeSource points to no evidence that this information was not shared among its own employees, and although it is clear that PrimeSource would prefer that its vendor information not "be out on the street," other companies are free to ask questions and obtain information about where PrimeSource sources its products. (Tr. 463.) All of that evidence reflects the relative ease with which players in the industry are able to obtain information about supplier identities and contacts. So even though it is clear that supplier information is valuable to PrimeSource, the bulk of the relevant trade secrets factors weigh against a finding that its suppliers' identities or contact information constitute trade secrets.[6]

---

[6] At the hearing and in its reply brief, PrimeSource points to the fact that during his time as PrimeSource co-CEO Fishbein approved a marketing document that referred to PrimeSource's supplier information as its "secret sauce." (R. 155, Pl.'s Reply at 27.) But Fishbein testified that the "secret sauce" phrase was suggested by the bank helping PrimeSource promote itself for sale, and that the term was a form of puffery to make PrimeSource more interesting to prospective buyers. (Tr. 1390-91.) While Fishbein's willingness to implement a suggestion that was not accurate

PrimeSource also argues that Zinman's email correspondence with vendors shows that she misappropriated trade secret information consisting of the quality and reliability of various mills, contract terms used with the mills, and supplier cost information. (R. 155, Pl.'s Reply at 28.) In its post-hearing briefs, PrimeSource makes no attempt to demonstrate how the relevant trade secret factors apply to these specific sub-categories of information, but the evidence suggests that several of the factors would weigh more heavily in favor of PrimeSource with respect to the quality and reliability of mills and specific contract terms. Judd testified that PrimeSource invested significant time and resources into evaluating the quality and reliability of various mills and this information was highly valuable because mill mistakes could be extraordinarily expensive. (Tr. 56-57, 77-78.) And there is no information that its precise contract terms with vendors or related costs are publicly known or easily duplicated.

Although PrimeSource may have shown some likelihood of success on its claim that information about its contract terms with suppliers and their quality and reliability were generally treated as trade secrets, the hearing evidence does not support a conclusion that Zinman misappropriated that information for several reasons. First, Zinman repeatedly and credibly testified that she took nothing with her when she left PrimeSource. There is no evidence whatsoever that Zinman took any documents with her when she left PrimeSource or that any information Zinman

diminishes Fishbein's credibility, this court accepts the puffery explanation given that the supplier information is indeed not secret. The presence of that phrase in marketing materials does little to establish that categorically, all PrimeSource supplier information is sufficiently secret to warrant trade secret protection.

used in contacting potential vendors for Huttig exists anywhere other than in her memory.

More importantly, the hearing evidence points to a conclusion that by the time Zinman began working for Huttig, any trade secret information regarding vendor prices, quality, or reliability that Zinman had been privy to at PrimeSource was stale. Information that is too old to hold any value loses any protection it would otherwise be entitled to as a trade secret. *See UTStarcom, Inc. v. Starent Networks, Corp.*, 675 F. Supp. 2d 854, 871-72 (N.D. Ill. 2009). Especially where, as here, there is no evidence that the defendant took any documents or relied on anything other than her memory, information such as vendor pricing that is stale does not plausibly support a trade secrets claim. *See Cortz, Inc. v. Doheny Enters., Inc.*, No. 17 CV 2187, 2017 WL 2958071, at *12 (N.D. Ill. July 11, 2017). It is undisputed that Zinman sat out her non-compete agreement before beginning to work for Huttig, and her employment there began almost two years after she retired as PrimeSource's CEO. (Tr. 1111, 1156-57.) PrimeSource has pointed to no evidence to rebut Zinman's credible testimony that supplier contract terms, costs, and quality information all come with a short shelf life. Specifically, Zinman testified that whether a given mill can be considered a "good quality" mill is something that can change over time, depending on whether the mill develops claim issues, goes through management changes, or experiences other quality-changing factors. (Tr. 1270-71.) She also testified that because fasteners are a very basic commodity their prices are tied to the cost of wire rod, the raw material from which

they are made. (Tr. 1320.) The price of fastener production fluctuates with the commodity price of wire rod, and accordingly can be extremely unstable even within a period of a few weeks or days. (Tr. 1320-21.) Zinman testified that given those price fluctuations, as a rule price quotes from vendors are only good for 30 days, and sometimes only 72 hours. (Tr. 1321.) Given this undisputed testimony, PrimeSource is unlikely to be able to show that Zinman's knowledge of PrimeSource trade secret information related to vendor quality, reliability, or prices was not stale by the time Zinman joined Huttig.

As for PrimeSource's contract terms with suppliers, PrimeSource has not pointed to evidence that Zinman actually used those terms in corresponding with vendors on behalf of Huttig. None of the exhibits PrimeSource submitted shows that Zinman explicitly or implicitly referenced specific PrimeSource contract terms. Instead, Zinman simply referenced her former position at PrimeSource as context in re-introducing herself to prospective suppliers. (R. 155, Pl.'s Reply at 28-29 and PXs cited therein.) Obviously the fact of Zinman's prior role as CEO at PrimeSource is a matter of public knowledge, not a trade secret. In its reply brief, PrimeSource points in support of its misappropriation claim to an email in which Zinman wrote to another Huttig employee that a customer was "getting the same exact quality they have been getting from PS-same mill-same quality. They know the [customer] specs." (R. 155, Pl.'s Reply at 29; PX 230.) But nothing in the text of that email reveals any specific PrimeSource contract terms that Zinman could have misappropriated. And as set forth above, the identity of the mills PrimeSource

worked with does not amount to a trade secret and any information about production quality that Zinman obtained at PrimeSource was stale by the time she joined Huttig. Without more, the emails PrimeSource has pointed to are unlikely to successfully support its claim that Zinman actually misappropriated any trade secrets.

### b. Trade Secrets Claims Against Fishbein & Furio

PrimeSource argues that Fishbein and Furio misappropriated trade secrets in the form of marketing and budgeting information, and that Furio misappropriated trade secrets about inventory management. (R. 152, Pl.'s Mem. at 69-71.) PrimeSource cites these as categories of trade secrets, rather than presenting the court with any specific documents or data that amount to trade secrets. As was the case with Zinman, PrimeSource has not presented any evidence that Fishbein or Furio took any documents or other materials with them when they left PrimeSource. And PrimeSource's own CEO testified that these categories of information are so voluminous that he would be unable to commit them to memory. (Tr. 104-05.)

Because PrimeSource has pointed only to general categories of marketing and budgeting information it asserts amount to trade secrets, the lack of specificity greatly reduces its chances of demonstrating that Fishbein or Furio misappropriated its trade secrets. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (noting that the plaintiff must point to concrete secrets, not broad areas of technology, to prevail on trade secrets claim);

*Service Ctrs. of Chi., Inc. v. Minogue*, 535 N.E.2d 1132, 1135 (Ill. App. Ct. 1989) (reversing grant of preliminary injunction where plaintiff "consistently failed to identify with any degree of particularity the alleged trade secrets or confidential information in need of protection"). To prevail on a trade secret claim the plaintiff must do more than produce lists of general information and assert that it contains trade secrets. *See GlobalTap LLC v. Elkay Mfg. Co.*, No. 13 CV 632, 2015 WL 94235, at *5 (N.D. Ill. Jan. 5, 2015). Accordingly, where a plaintiff only cites general categories of information, but "never singles out any particular trade secret, explaining how it created and safeguarded that particular bit of information," the lack of particularity renders it unlikely to succeed on its trade secrets misappropriation claim. *Traffic Tech, Inc. v. Kreiter*, No. 14 CV 7528, 2015 WL 9259544, at *20 (N.D. Ill. Dec. 18, 2015).

With respect to marketing information, PrimeSource cites nothing more specific than a PrimeSource initiative to grow direct sales, general marketing strategies, and the "structure, funding and opportunities offered by PrimeSource's Premier Club." (R. 155, Pl.'s Reply at 29.) But Judd testified that much of that information is not even confidential, let alone a trade secret. He testified that market direction is not confidential, (Tr. 203, 210), and it is hard to see the idea that PrimeSource wanted to grow direct sales as anything more than a general market direction. He testified that the existence of PrimeSource's Premier Club and who attends is all public information, and that PrimeSource's customers are free to share any information they have about that program. (Tr. 115-16.) It may

38

well be that there is information connected to PrimeSource's growth initiative and Premier Club structure that could meet the trade secrets standards, but PrimeSource has not pointed to that information with any level of specificity that would allow the court to properly analyze its trade secret assertion. *See GlobalTap LLC*, 2015 WL 94235, at *5.

With respect to the category of inventory management, PrimeSource has not provided much evidence in support of its assertion that PrimeSource treats its SKU numbers or product numbers or the layout or inventory stocking methods at its distribution centers as trade secrets. At the hearing Judd admitted that PrimeSource allows its customers to tour its distribution centers and on at least one occasion invited the press to take pictures inside a warehouse. (Tr. 101-02.) PrimeSource does not require vendors, customers, or prospective customers who it invites to warehouse open houses to sign non-disclosure agreements. (Tr. 1117-18.) That evidence suggests that PrimeSource did not treat information such as the general layout or the types of racking systems it used inside its distribution centers as trade secrets. Again, there may be specific information related to inventory management that PrimeSource maintains with a level of secrecy that would make it protectable as a trade secret, but it has not identified that information with sufficient specificity to allow the court to analyze its assertion. Because PrimeSource has not identified any concrete trade secrets that Fishbein or Furio misappropriated, the court concludes that it is unlikely to succeed on its trade secrets claims as related to these two defendants.

### c. Trade Secrets Claims Against the Felten Defendants

With respect to the Felten Defendants, PrimeSource's ITSA and DTSA claims turn on its assertion that they misappropriated trade secrets in the form of PrimeSource's customer lists. Although PrimeSource concedes that the identity of some of its customers is available publicly, it argues that information about its customers' buying habits, whether the customer made direct ship orders, and the customer's contact person are PrimeSource trade secrets. (R. 152, Pl.'s Mem. at 67.)

Customer lists are included in the ITSA as an example of the kind of information that can warrant trade secret protection. *See* 765 ILCS 1065/2(d). "Although the DTSA does not expressly include customer lists within its definition of a trade secret, its definition includes any valuable business information for which reasonable measures are taken to maintain secrecy, and is therefore applicable to customer lists." *Mickey's Linen*. 2017 WL 2970593, at *20 n.2. But customer lists do not automatically acquire trade secret status simply because they fall within the statutory definitions. *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 922 (Ill. App. Ct. 2005) ("Whether customer lists are trade secrets depends on the facts of each case."). Rather, factors such as whether the customer information "was developed slowly and through hard work, stored in a secure location, and shared with employees on a need-to-know basis and only after they signed confidentiality agreements," help determine whether the information qualifies as a trade secret. *UTStarmcom*, 675 F. Supp. 2d at 866-67. The fact that an employee signs an agreement restricting his use of confidential information standing alone is

insufficient to establish that the information is entitled to trade-secret protection. *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F. Supp. 2d 846, 851 (N.D. Ill. 2011).

Although PrimeSource has submitted sufficient evidence to show that its customers' buying preferences and direct ship status may be *confidential*, it has done little to show that this specific information was treated with sufficient secrecy to warrant *trade-secret* protection. First, at the hearing Judd testified that customer buying preferences including the frequency of purchases and seasonal demands are confidential, but not trade secrets. (Tr. 120-21.) He testified "I believe there's some information with the other [Felten] group that was trade secrets." (Tr. 121.) But Judd did not explain what that information is. Second, other than the fact that the Felten Defendants all were required to sign nondisclosure agreements characterizing this information as confidential, PrimeSource has not identified additional steps it took to protect this information. Although Judd and Eric Royse (PrimeSource's Senior Vice President, (Tr. 105)) testified generally that employees completed training regarding the correct handling of confidential information, and that it limits electronic "network access based on [the] type of role and information needed for the role," (R. 152, Pl.'s Mem. at 18), that evidence does not explicitly address these general categories of information, let alone any specific customer buying or direct-ship preferences. Third, Royse testified that he does not consider his competitor's market pricing and quoting process to customers to even be confidential, (Tr. 460), and some of the

Felten Defendants testified that it was common for sales people to ask customers about the prices and order information they got from other competitors in the marketplace, (Tr. 597-98, 679-80). In other words, customers freely shared with distributors information about what they paid to competing distributors for certain amounts of specific products. Where customers are at liberty to disclose pricing structures and those structures are not unique, without evidence that those details were closely guarded by the plaintiff the customer information does not amount to a trade secret. *See Carbonic Fire Extinguishers*, 190 Ill. App. 3d at 952-53; *UTStarcom, Inc.*, 675 F. Supp. 2d at 866 ("Absent a showing to the contrary, Illinois courts tend to treat price lists as non-trade secrets, as customers often share that information with one another.); *but see Mickey's Linen*, 2017 WL 3970593, at *10 (stating that customer pricing information can be trade secret even if customers at liberty to divulge in context where employer closely guarded information). Specifically included in those price quotes are the types of product ordered, so it is unclear that PrimeSource is even asserting that the type of product a customer purchases is the trade secret information. *See Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 772 N.E.2d 768, 781 (Ill. App. Ct. 2002) (noting that customer data "including pricing, service history, key decision-makers, and customer contract terms" are protected as trade secrets only where plaintiff shows information derived value from secrecy). Once the court excludes from the category of "customer preferences" information about pricing of certain quantities of products, what information is left is ambiguous. Trade secret status under the ITSA and DTSA

hinges on the steps taken to maintain secrecy and the value that secrecy provides to the trade secret owner. *See Cortz, Inc.*, 2017 WL 2958071, at *8-*9. Because PrimeSource has done little to establish that its customers' buying habits or preferences were secret, and has not pinpointed for the court the customer information it contends is a trade secret, the court must conclude that it has little chance of succeeding on its claim of trade secret misappropriation against the Felten Defendants.

### d.    Inevitable Disclosure Theory

Although this court has concluded that PrimeSource has shown little chance of succeeding on the merits of its claims that the categories of information it has identified qualify as trade secrets, in the interest of completeness it will address its inevitable disclosure theory of misappropriation. The inevitable disclosure doctrine allows a plaintiff to "prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). "Courts do not often apply the inevitable disclosure doctrine, recognizing that a broad application would be an effective bar against employees taking similar positions with competitive entities." *Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d 796, 809 (N.D. Ill. 2011). To protect against that broad application, the plaintiff must do more than show that a former employee went to a direct competitor to do the same job and demonstrate more than a fear that the former employee will disclose trade secrets. *See PepsiCo*, 54 F.3d at 1269-70.

PrimeSource argues that it has established more than a fear that the defendants will misuse its trade secrets because all of the defendants are working in similar roles to their former PrimeSource positions in a new division of Huttig designed to compete with PrimeSource's fastener business. Recognizing that to prevail on an inevitable disclosure theory it is insufficient to show that a skilled employee took his skills to a direct competitor, *PepsiCo*, 54 F.3d at 1269; *Cortz*, 2017 WL 2958071, at *12, PrimeSource also argues that Huttig cannot be trusted to prevent the former PrimeSource employees from disclosing its trade secrets. (R. 152, Pl.'s Mem. at 75.) Although it acknowledges that Huttig required all of the defendants to sign agreements that they would not use PrimeSource's trade secret information, it asserts that this fact "should be given little deference," because according to it, Fishbein instructed the Felten Defendants to recreate customer lists from their memory and testified "that he believed he was free to use at Huttig anything he had learned while at PrimeSource." (Id.) As for the customer lists, the testimony PrimeSource cites just reflects Furio's "expectation" that Fishbein would have directed the Felten Defendants to write down the identity of customers they remember serving at PrimeSource. (Tr. 1072.) But PrimeSource concedes that its customers' identities are not trade secrets and there is no evidence that Fishbein asked the Felten Defendants to include trade secret information along with the customer identities. Fishbein's testimony that he does not believe that his memory of anything he learned as CEO of PrimeSource is confidential is more troubling. (Tr. 1413.) That testimony suggests that to the extent Fishbein remembers

information that qualifies as a PrimeSource trade secret, PrimeSource has shown some likelihood of succeeding on its claim that he will inevitably disclose that information. But again, as set forth above, PrimeSource has not identified with any particularity what trade secret information it thinks Fishbein will inevitably disclose. Moreover, Fishbein's testimony does not extend to any of the other defendants, and PrimeSource has not explained why the inevitable disclosure doctrine should apply to them, beyond pointing to their similar positions at Huttig. That is insufficient to demonstrate inevitable disclosure. *See PepsiCo*, 54 F.3d at 1269. For all of these reasons, the court concludes that PrimeSource's likelihood of prevailing on its claims under the ITSA or the DTSA at the merits phase of this litigation is low.

## 2.     The CEO Defendants' Non-Disclosure Agreements

Even though the court has concluded that PrimeSource is unlikely to show that the defendants misappropriated trade secrets, whether they breached the non-disclosure provisions of their employment agreements by sharing confidential information requires a distinct analysis. The CEO Defendants all signed employment agreements while at PrimeSource that include non-disclosure provisions precluding them from disclosing to any third-party not connected to or employed by PrimeSource any confidential information relating to PrimeSource's "research, development, inventions, suppliers, customers, purchasing, accounting, finance, price lists, and marketing." (JX 3 ¶ 4.1; JX 9 ¶ 4.1; JX 11 ¶ 4.1.) The parties agree that these provisions are "evergreen," meaning they have no

expiration date, and that pursuant to the agreements' choice of law provisions, they are governed by New York law.[7] PrimeSource points to the same categories of information cited in support of its trade secrets claims to argue that the CEO Defendants all have breached the non-disclosure covenants in the course of their work for Huttig.

New York courts recognize an employer's legitimate interest in preventing the disclosure of the employer's confidential information. *Reed, Roberts Assoc. v. Strauman*, 40 N.Y.2d 303, 308 (N.Y. App. 1976). "Although covenants that tend to prevent employees from pursuing similar employment upon termination or retirement are disfavored by the law, reasonable restrictions related to the disclosure of trade secrets or confidential customer information will be enforced." *Perfect Fit Glove Co. v. Post*, 635 N.Y.S. 2d 917, 918 (N.Y. App. Div. 1995) (internal citations omitted). To prevail on its claim that the CEO Defendants breached their non-disclosure agreements, PrimeSource must show: (1) the existence of a contract; (2) the plaintiff's adequate performance; (3) breach of the contract by the defendants; and (4) damages stemming from the breach. *See Northern Shipping Funds I, LLC v. Icon Capital Corp.*, No. 12 Civ. 3584 (JCF), 2013 WL 1500333, at *8 (S.D.N.Y. Apr. 12, 2013) (applying standard breach of contract principles to breach

---

[7] In their post-hearing briefs, both parties assert that New York law applies to the CEO Defendants' employment agreements based on those agreements' choice of law provisions. Although this court applies federal law with respect to the governing preliminary injunction standards, given the parties' agreement with respect to the law governing these restrictive covenants, this court will apply New York law in considering PrimeSource's likelihood of success with respect to its claims stemming from the CEO Defendants' agreements. *See Turnell*, 796 F.3d at 661.

of confidentiality provision). Here, the parties' dispute hinges on the second prong—whether PrimeSource is likely to succeed in showing that the CEO Defendants breached their non-disclosure covenants.

PrimeSource argues that it is likely to succeed in demonstrating that Zinman breached the non-disclosure provision by using PrimeSource's confidential supplier information in communicating with potential vendors on behalf of Huttig. Specifically, it asserts that she breached the contract by recreating "from memory a list of the mills she recalled working with at PrimeSource and then, within 24 hours, reached out to those supplier contacts, referenced her previous employment at PrimeSource, and referenced confidential arrangements and agreements between PrimeSource and certain of the suppliers all in an attempt to obtain quick access to product for the Huttig-Grip Division." (R. 152, Pl.'s Mem. at 55.) PrimeSource does not identify any specific communications or confidential information in making that assertion.

As explained above, the identities of the vendors PrimeSource used is not confidential, and there is no evidence to counter Zinman's testimony that except for one contact that she happened to remember, she used publicly available resources to find the contact information she used to email vendors on behalf of Huttig. It is also undisputed that Zinman did not take any documents with her when she left PrimeSource almost two years before starting at Huttig. To the extent that PrimeSource is arguing that she breached her non-disclosure agreement by using or disclosing her knowledge of how vendors supplied customers, in New York "[a]n

employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential." *Natural Organics, Inc. v. Kirkendall*, 52 A.D. 3d 488, 489 (N.Y. App. Div. 2008) (quotation omitted). Where there is no evidence that the former employee stole information or engaged in wrongful tactics, "[t]he mere recollection of such information as a result of casual memory is not actionable." *Zurich Depository Corp. v. Gilenson*, 121 A.D.2d 443, 445 (N.Y. App. Div. 1986). That is particularly true where the identities of distributors who purchased products are generally known in the industry and where data like customer preferences and pricing information are freely communicated between distributors and manufacturers. *See Scott Paper Co. v. Finnegan*, 101 A.D.2d 787, 789 (N.Y. App. Div. 1984). There was abundant hearing evidence that manufacturers who service building products distributors including PrimeSource and Huttig freely share information about which distributors they are servicing, what products they are producing for those distributors, and pricing. Accordingly, and because PrimeSource has not highlighted with any particularity which communication disclosed what confidential information, the court concludes that it is unlikely to succeed in showing that Zinman has breached her non-disclosure obligations during her tenure at Huttig.

Turning to PrimeSource's breach of contract claims against Fishbein and Furio, again it has not pointed to any specific actions or communications to show that the contracts were breached. Instead, PrimeSource attempts to establish breach simply by pointing to the similarities between their roles at PrimeSource

and at Huttig.  For example, it argues that "it is more likely than not that Furio put to use PrimeSource's inventory management information," because he made distribution stocking decisions at PrimeSource and at Huttig.  (R. 152, Pl.'s Mem. at 46.)  Similarly, it asserts that "it is more likely than not" that they both used "information they learned at PrimeSource" to create a Huttig-Grip budget, because Huttig did not have a developed direct shipment business before they arrived, and PrimeSource did.  (Id. at 47.)  But Judd testified that PrimeSource was not claiming that Fishbein or Furio memorized its budget information, (Tr. 107-08), and PrimeSource has not identified with any particularity what confidential information they disclosed.  For example, they have not pointed to any evidence comparing specific data in PrimeSource budgets that Fishbein and Furio helped develop to specific data in the Huttig-Grip Division's budget to support their assertion that it is likely they used PrimeSource's budget information.  With respect to marketing information, the only specific evidence PrimeSource points to regarding Fishbein's disclosure of confidential information (it identifies none related to Furio) is that he sent an email characterizing a particular marketing plan as being important. (R. 152, Pl.'s Mem. at 45, 69-70.)  But there is no evidence that Fishbein learned of that marketing plan in the course of his employment at PrimeSource.  Moreover, it is insufficient under New York law to point to broad "strategic plans" to demonstrate that confidential information was misappropriated without explaining what that specific information was or why it was confidential.  *See Marsh USA Inc. v. Karasaki*, No. 08 Civ. 4195(JGK), 2008 WL 4778239, at *21 (S.D.N.Y. Oct. 31,

2008).  Given the lack of evidence demonstrating that Fishbein or Furio actually breached the non-disclosure agreements, this court concludes that PrimeSource is unlikely to succeed on the merits of these claims.[8]

### 3.    The Felten Defendants' Non-Disclosure Agreements

PrimeSource also argues that the Felten Defendants violated their non-disclosure agreements by using confidential customer information to develop call lists that they used or traded with other salespeople at Huttig.  (R. 152, Pl.'s Mem. at 62.)  All five Felten Defendants signed non-disclosure agreements while at PrimeSource precluding them from disclosing any non-public information to third parties even after the end of their employment, including any information about the nature and terms of PrimeSource's relationships with its customers.  (JX 13 ¶ II; JX 14 ¶ II; JX 15 ¶¶1, 5; JX 16 ¶ II; JX 17 ¶ II.)  Although at the motion to dismiss stage the Felten Defendants argued that Illinois law should govern the enforceability of their employment agreements with PrimeSource, they did not file objections to this court's report and recommendation ruling that Texas law should apply, and this recommendation was adopted in full.  (No. 16 CV 11468, R. 141.)  In their current brief, the Felten Defendants recognize the rulings with respect to the application of Texas law to their respective PrimeSource agreements and present their arguments under Texas law.  (R. 154, Defs.' Mem. at 90-98.)  For all of these

---

[8]    PrimeSource does not appear to be putting forward an inevitable disclosure theory as it relates to the breach of the nondisclosure claim, and it has not cited any cases showing that such a theory is viable under New York law with respect to a breach of contract claim, as opposed to the trade secret context.

reasons, the court will evaluate PrimeSource's likelihood of success with respect to its breach of covenant claims against the Felten Defendants under Texas law.

Although Texas has a statute governing the enforceability of covenants not to compete, *see* Tex. Bus. & Com. Code Ann. § 15.50(a) (West 2011), non-disclosure agreements are not expressly governed by that statute, *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011). And because non-disclosure agreements are not considered to be against public policy in Texas, there is no requirement with respect to limitations on the duration or geography covered. *See Zep Mfg. Co. v. Harthcock & Panther Indus., Inc.*, 824 S.W.2d 654, 663 (Tex. App. 1992). Therefore to prevail on a claim that the Felten Defendants breached their confidentiality agreements, PrimeSource must show that the contract is valid, PrimeSource performed, the Felten Defendants breached the contract, and PrimeSource suffered damages as a result. *See Fomento de Construcciones y Contratas, S.A. v. VeroLube, Inc.*, No. 4:14-CV-2199, 2015 WL 1235738, at *1 (S.D. Tex. Mar. 13, 2015). In evaluating a claim that a non-disclosure covenant has been breached, the court must bear in mind that such provisions do not "prohibit the former employee from using, in competition with the former employer, the general knowledge, skill, and experience acquired in former employer." *Shoreline Gas, Inc. v. McGaughey*, No. 13-07-364-CV, 2008 WL 1747624, at *10 (Tex. App. 2008). Moreover, because Texas courts do not appear to apply categorically the inevitable disclosure doctrine to non-disclosure agreements, *see Cardoni v. Prosperity Bank*, 805 F.3d 573, 589-90 (5th Cir. 2015), to prevail

PrimeSource needs to show that the Felten Defendants actually breached or are breaching their non-disclosure agreements.

In the proposed conclusions of law sections of PrimeSource's post-hearing briefs, it argues that the Felten Defendants breached their non-disclosure agreements by incorporating confidential customer information into call lists, but does not provide more specifics about what actions each individual defendant took that amount to a breach. PrimeSource has made clear that it "is not maintaining that the 'mere identity' of customers is confidential. What is confidential is information about what the customers purchase, when the customers purchase it, [and] contacts at those customers." (R. 155, Pl.'s Reply at 9.) But as to Felten and Whitehead, PrimeSource has not presented evidence that they included anything other than the names of customers, the city and state where the customer is located, and the name of a contact person on the list they developed for Huttig. (R. 152, Pl.'s Mem. at 39; Tr. 739-40, 907-09.)[9] Without more, it is unclear what confidential information PrimeSource thinks Felten or Whitehead disclosed. To prevail on its breach of the confidentiality agreement claims, PrimeSource must do more than make a "speculative showing" that Felten and Whitehead disclosed confidential information. *See Cardoni*, 805 F.3d at 589. Because PrimeSource has not identified the confidential information they shared with any particularity, the court concludes

[9] Whitehead's customer list includes columns describing the products the customer purchases, but the call note column suggests that Whitehead added that information after making calls to the customers while at Huttig. (PX 229.) Whitehead did not sign a non-solicitation agreement while at PrimeSource, and PrimeSource has not shown that these columns represent information Whitehead learned while at PrimeSource.

that it has shown a low likelihood of succeeding on its claims for breach of non-disclosure agreements with respect to these two defendants.

With respect to Kessler, Kottmeyer, and Sagunsky, PrimeSource has shown that they included in their customer lists information beyond their customers' identities. Kottmeyer included in his list the names of the contacts he had worked with, along with references to what products that customer purchased from PrimeSource. (PX 138, Tr. 805.) Sagunsky's list of over 50 customers he serviced at PrimeSource included similar information, along with in some instances notes about his relationships with specific customer contacts, the time of year they purchased products, and the amount of products they had purchased. (PX 160, Tr. 656-68.) Kessler's list of 220 customers he serviced at PrimeSource has the most additional information, including information about the products the customer purchased from PrimeSource and the branch number for the PrimeSource branch that serviced the customer. (PX 141; Tr. 543, 545.) In one entry Kessler included the PrimeSource SKU number that corresponded to the product the customer purchased. (PX 141; Tr. 546-47.) The Felten Defendants' non-disclosure agreements specify that they may not disclose non-public information about the nature or terms of PrimeSource's relationship with its customers. Arguably, the additional product information Kessler, Kottmeyer, and Sagunsky included on the lists that they provided to Huttig include that information, and go beyond the "general knowledge, skill, and experience" they acquired at PrimeSource. *See Shoreline Gas*, 2008 WL 1747624, at *10. Accordingly, PrimeSource has

demonstrated at least some likelihood of success on the merits of its claims that Kessler, Kottmeyer, and Sagunsky breached their nondisclosure agreements.

### 4.    Fishbein's and Furio's Non-Solicitation Agreement

PrimeSource argues that it is likely to succeed on its claims that Fishbein and Furio violated their non-solicitation covenants by contacting the Felten Defendants between December 2015 and September 2016 and by meeting with Zinman during that period.  (R. 152, Pl.'s Mem. at 53.)  In response, Huttig points out that those non-solicitation covenants expired on September 16, 2016, months before these lawsuits were filed, and argue that accordingly, injunctive relief is inappropriate with respect to those claims.  (R. 154, Defs.' Mem. at 62-64.) Although the defendants raised this argument both during the preliminary injunction hearing and in their post-hearing brief, PrimeSource has not addressed this argument in its post-hearing opening or reply briefs.  (R. 155, Pl.'s Reply at 16-18.)

Preliminary injunctions represent a form of prospective relief designed to prevent a harmful event, but "[o]nce the event in question occurs, any possible use for a preliminary injunction is expired."  *A.B. by Kehoe v. Housing Auth. of South Bend*, 683 F.3d 844, 845 (7th Cir. 2012); *see also Aladdin Cap. Holdings, LLC v. Donoyan*, 438 Fed. Appx. 14, 16 (2d Cir. 2011) (dismissing appeal as moot where "it is no longer possible to grant *preliminary* relief enjoining the violation of these covenants, which have, by their own terms, expired" (emphasis in original)).  Under New York law, which the parties agree applies to the CEO Defendants' employment

agreements with PrimeSource, courts generally will not grant injunctive relief to enforce a restrictive covenant beyond its term. *See OTG Mgmt., LLC v. Konstantinidis*, 967 N.Y.S.2d 823, 826 (N.Y. Sup. Ct. 2013) (stating that preliminary injunction automatically expires on the day non-solicitation clause expires); *Mitel Telecomms. Sys., Inc. v. Napolitano*, 640 N.Y.S.2d 113 (N.Y. App. Div. 1996) ("Plaintiff is also not entitled to a preliminary injunction enjoining defendants from soliciting their former customers, since the parties contracted to limit the non-solicitation of customers to three years following the sale of the business, which period also has already elapsed."). Even where preliminary injunctive relief is appropriate during the term of a non-solicitation covenant, the injunction must be tailored to expire along with the covenant. *See Ingenuit, Ltd. v. Harriff*, 822 N.Y.S.2d 301, 303 (N.Y. App. Div. 2006). New York courts will not consider even partial enforcement of a restrictive covenant through an injunction where the covenant has expired. *See Zinter Handling, Inc. v. Britton*, 46 A.D.3d 998, 1001-02 (N.Y. App. Div. 2007) ("Since the covenant not to compete has now expired as to both defendants, we perceive no legitimate basis upon which to consider partial enforcement.").

Given the case law suggesting that New York courts will not enforce a non-solicitation clause beyond its term, and especially in light of PrimeSource's silence on the issue, this court concludes that PrimeSource is not entitled to preliminary injunctive relief with respect to its claims that Fishbein and Furio violated the non-solicitation provisions of their respective employment agreements. Based on the

limited consent in this case, there is no need for the court to comment further on PrimeSource's likelihood of succeeding on the merits of these claims.

### 5. Felten's, Kessler's, Kottmeyer's, and Sagunsky's Non-Compete Covenants

PrimeSource argues that it has shown the requisite likelihood of success on the merits of its claim that by working for Huttig, Felten, Kessler, Kottmeyer, and Sagunsky breached and are continuing to breach their covenants not to compete.[10] Felten, Kessler, Kottmeyer, and Sagunsky all signed agreements including a covenant not to compete stating that for a period of 18 months following the end of their employment at PrimeSource they will not "[e]nter the employ of, or render any services to, any person, firm or business that is engaged in any business competitive with that of PrimeSource" within a 300 mile radius of any PrimeSource distribution center where the defendant reported or any sales territory the defendant serviced. (JX 13 ¶ IV; JX 14 ¶ IV; JX 16 ¶ IV; JX 17 ¶ IV.) Despite having entered those agreements, Felten, Kessler, Kottmeyer, and Sagunsky all went to work for the Huttig-Grip Division within a few miles of their PrimeSource offices just days after resigning from PrimeSource.

The defendants do not deny these facts, but instead argue that PrimeSource has no reasonable likelihood of success on its breach of contract claims because, according to them, the non-compete covenants are unenforceable under Texas law. (R. 154, Defs.' Mem. at 91.) Specifically, they argue that the non-compete

---

[10] Defendant Whitehead did not sign either a non-solicitation or a non-competition agreement during his tenure at PrimeSource.

covenants' time and geographic restraints on their ability to work for a competitor are so broad that PrimeSource has no chance of showing either that they are reasonable, or that they can be reformed or "blue-penciled" by the court in a way to render them enforceable.

Under Texas law, "[c]ovenants that place limits on former employees' professional mobility" are "restraints on trade and are governed by the [Covenant Not to Compete] Act." *Marsh USA*, 354 S.W.3d at 768. Under Texas's Covenants Not to Compete Act ("the Act"), "[a] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code Ann. § 15.50(a) (West 2011). "Whether a covenant imposes a reasonable restraint on trade is a question of law for the court." *Cobb v. Caye Publ'g Grp., Inc.* 322 S.W.3d 780, 783 (Tex. App. 2010). Where a restrictive covenant is unreasonably restrictive under the circumstances, rather than invalidating the covenant, the court will "attempt to reform the unenforceable provisions to make them reasonable as to time, geographical area, or scope of activity to be restrained." *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 436 (S.D. Tex. 2008). The Act makes clear that "the court *shall* reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable

and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and enforce the covenant as reformed." Tex. Bus. & Com. Code Ann. § 15.51(c) (emphasis added). However, Texas law calls for the reformation of a restrictive covenant's temporal limitations only where its restriction is unreasonably long. *See* Tex. Bus. & Com. Code Ann. § 15.51(c). And Texas courts have repeatedly upheld as reasonable restrictions on competition lasting from two to five years. *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 655 (Tex. App. 2010) (citing cases).

The Felten Defendants argue that the 18-month restriction on working for a PrimeSource competitor represents an unreasonable restraint that is not tied to any of PrimeSource's legitimate business interests. They point out that Judd testified at the hearing that the current PrimeSource employment agreement for people in roles like those filled by Felten, Kessler, Kottmeyer, and Sagunsky at PrimeSource (specifically, non-executives) includes only a nine-month restriction on post-termination competition.[11]  (Tr. 144-145.)  According to the defendants, Judd's testimony amounts to an admission that a nine-month restriction is all that is needed to protect PrimeSource's legitimate business interests, and they argue that accordingly, the court should blue-pencil the temporal restriction from 18 months to 9 months.  Were the court to do so, the non-compete provisions would have

---

[11]  According to PrimeSource, under the new guidelines people serving in the roles performed by Kessler and Sagunsky are subject to a twelve-month, not a nine-month, restriction.  (R. 155, Pl.'s Reply at 20.)

effectively expired in August 2017, and according to the defendants, they could no longer be enforced through an injunction. (R. 154, Defs.' Mem. at 94.)

Given the willingness of Texas courts to enforce temporal restrictions in non-compete provisions that are significantly longer than the 18-month restriction at issue here, the court concludes that PrimeSource has shown some likelihood of success on the merits of its claim that this restriction is enforceable as written. The fact that PrimeSource currently uses a non-compete covenant with a shorter duration for its salesforce does not change that conclusion. There may have been changes at PrimeSource or among its current workforce that motivated PrimeSource to reduce the duration of its non-compete provisions, but that does not mean that at the time Felten, Kessler, Kottmeyer, and Sagunsky signed their agreements there was no basis for the 18-month restriction, or that the connection between the 18-month limit and PrimeSource's legitimate interests is no longer valid. Essentially, Huttig is arguing that anytime a company changes its policy with respect to the length of its non-compete provisions the court must necessarily find any greater restrictions in previous contracts unreasonable, but that would have a negative effect on companies' willingness to reconsider their restrictive covenants as their needs change. Moreover, Texas courts readily enforce temporal limitations much longer than those at issue here without engaging in much hand-wringing or analysis. *See, e.g., McKissock, LLC v. Martin*, __ F.Supp.3d __, 2016 WL 8138815, at *11 (W.D. Tex. Sept. 10, 2016) (stating, without analysis, that "[r]egarding the duration of the Non-Compete Agreement, the Court also finds that

a two-year restriction is reasonable"); *Brink's Inc. v. Patrick*, No. 3:14-CV-775-B, 2014 WL 2931824, at *5 (N.D. Tex. Jun. 27, 2014) ("[E]ven if the agreement did effectively impose a four-year restriction, the Court cannot conclude that such a restriction would be unreasonable under Texas law."); *Drummond Am., LLC v. Share Corp.*, 692 F.Supp.2d 650, 655 (S.D. Tex. 2010) (noting that two-year "restriction appears reasonably necessary to protect [the employer's] business interest in maintaining confidential sales information and customer lists" and stating that "Texas courts have enforced covenants not to compete with similar or greater restrictions"); *Evans Consoles Inc. v. Hoffman Video Sys., Inc.*, No. 3:01-CV-1333-P, 2001 WL 36238982, at *7 (N.D. Tex. Dec. 6, 2001) (summarily stating that three years is not an unreasonable time limit). Accordingly, and because the defendants have not cited any cases where an 18-month restriction was found unenforceable in a similar context, the court declines the defendants' invitation to recast the restrictions as 9-month limitations.

Turning to the geographic limitations, the defendants argue that restricting competition within a 300-mile radius of their sales territories or the PrimeSource distribution centers where they reported is unreasonably broad and therefore unenforceable as written. There is merit to that argument. As with time restraints, geographical limits in non-compete agreements are unreasonable if they are broader than necessary to protect an employer's goodwill or other legitimate business interests. *Cobb*, 322 S.W.3d at 783. "A reasonable geographic scope is generally considered to be the territory in which the employee worked for the

employer." *GE Betz, Inc. v. Moffitt-Johnson*, No. H-13-0459, 2014 WL 12596523, at *7 (S.D. Tex. Jun. 6, 2014) (quotation and citation omitted); *see also Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App. 2001). By contrast, industry-wide exclusions or covenants that restrict competition in virtually every metropolitan area in a state may be unreasonably broad. *See Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298 (Tex. App. 2004); *Gomez v. Zamora*, 814 S.W.2d 114, 118 (Tex. App. 1991) (concluding that covenant covering almost every major metropolitan area in Texas was too broad). But even where a non-compete covenant's geographic restrictions are overly broad, "Texas courts attempt to reform the unenforceable provisions to make them reasonable." *Rimkus*, 255 F.R.D. at 436.

This court agrees with the defendants that under Texas law the geographic restrictions here are overly broad as written. By their terms, the restrictions preclude the defendants from working for a PrimeSource competitor within 300 mile radius of any PrimeSource distribution center where the defendant reported or any sales territory the defendant serviced. In that way, the relevant terms are not tailored to restrict competition in the territory where the defendants actually worked, *see GE Betz*, 2014 WL 12596523, at *7, because the restrictions extend 300 miles beyond those territories. As an example illustrating the breadth of those restrictions, if one of the defendants serviced PrimeSource clients in an area that included Naperville, Illinois, he would be precluded under the terms of these restrictions from working for a competitor in Des Moines, Iowa during the pendency of the non-compete, even if he had never worked in Iowa while at PrimeSource.

Because the restriction extends well outside the territories where the defendants worked, PrimeSource is unlikely to succeed in showing that the covenants should be enforced as written. *See Rimkus*, 255 F.R.D. at 436.

Nevertheless, as PrimeSource correctly argues, even if the court were to reform the covenant to apply only to the territories in which the defendants actually worked (as opposed to a radius of 300 miles beyond that territory), PrimeSource is likely to succeed on its claim that they breached their non-compete covenants, because all four defendants are currently working in a Huttig-Grip office that is located less than two miles away from their former PrimeSource offices. (Tr. 529, 719, 864.) As PrimeSource points out, these facts render the defendants' unreasonableness argument purely academic, because given the requirement in Texas that unreasonable restrictions "shall" be reformed, *see* Tex. Bus. & Com. Code Ann. § 15.51(c), the non-compete covenant may be enforced in the territory where the defendants worked for PrimeSource, and they admit that Huttig-Grip is located practically next door. Accordingly, despite the overly broad geographic restriction in the defendants' non-compete covenants, PrimeSource has shown that it is likely to succeed on its claims that they breached those covenants even if reformed to conform to the defendants' previous work territories.

### 6. Felten's, Kessler's, Kottmeyer's, and Sagunsky's Non-Solicitation Covenants

Next, PrimeSource argues that it has shown a likelihood of success with respect to its claim that Felten, Kessler, Kottmeyer, and Sagunsky breached their non-solicitation covenants in their new roles at Huttig. The non-solicitation

provisions of their PrimeSource agreements, which are set to expire in May 2018, include the same geographic and temporal restrictions as apply to their non-compete covenants, and specify that they will not "[s]ell or offer for sale any products or services of the type sold or offered by PrimeSource to any customer to whom PrimeSource sold products or provided services or any prospect PrimeSource solicited for business during the two most recently complete calendar years." (JX 13 ¶ IV; JX 14 ¶ IV; JX 16 ¶ IV; JX 17 ¶ IV.) PrimeSource argues that the four relevant defendants violated the non-solicitation clause by making lists of the customers they serviced at PrimeSource, exchanging those lists, and calling on each other's customers. (R. 152, Pl.'s Mem. at 62-63.)

Again the defendants do not dispute that they exchanged customer lists or contacted each other's former customers, but instead argue that the non-solicitation provisions are unenforceable as written. Although the Act does not explicitly apply to non-solicitation covenants, Texas courts apply the same analysis to non-solicitation provisions as they do to covenants not to compete. *See Shoreline Gas*, 2008 WL 1747624, at *9-*10. As with non-competition covenants, restrictions on a former employee's "solicitation of the former employers' customers and employees are restraints on trade," and are enforceable only if reasonably constructed to protect the former employer's legitimate business interests. *Marsh USA*, 354 S.W.3d at 768. "Texas courts have held that nonsolicitation covenants that cover clients with whom the employee had no contact while working for the employer are

overbroad and not reasonably necessary to protect the employer's legitimate business interest in maintaining its client base." *Rimkus*, 255 F.R.D. at 439.

Here, the defendants challenge the scope of the non-solicitation covenants, pointing out that the language precluding them from soliciting any of PrimeSource's clients or prospective clients is not limited to the work they actually performed while at PrimeSource. (R. 154, Defs.' Mem. at 97.) Specifically, they argue that the scope of the precluded activity is unreasonably broad because the language extends to any customer that PrimeSource provided products or services to or solicited for business up to two years before the defendants' departure, instead of being tailored to the customers the defendants serviced and solicited. (Id.) Under Texas law, "[i]n the case of covenants applied to a personal services occupation, such as that of a salesman, a restraint on client solicitation is overbroad and unreasonable when it extends to clients with whom the employee had no dealings during his [or her] employment." *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App. 1996).

In response to the defendants' argument with respect to the scope of activity, PrimeSource merely asserts that "virtually identical clauses have been upheld" in Texas. (R. 155, Pl.'s Reply at 22.) But the two opinions it cites in support of that assertion involve non-solicitation clauses or circumstances that are distinguishable from the language and circumstances at issue here. In *Orchestratehr, Inc. v. Trombetta*, No. 3:13-CV-2110-KS-BH, 2016 WL 4563348, at *4 (N.D. Tex. Sept. 1, 2016), the defendant challenged an agreement that prevented him from directly or

indirectly soliciting his former employer's current clients. The court held that the provision preventing him from soliciting any of his former employer's current clients was not overbroad because the defendant "introduced no evidence that there is any client with which he has had no contact." *Id.* In other words, the provision preventing contact with any of his former employer's clients was tailored in that case to the clients with whom the defendant had engaged. *See id.* The non-solicitation agreement at issue in *Salas v. Chris Christensen Sys. Inc.*, No. 10-11-00107-CV, 2011 WL 4089999, at *18-*19 (Tex. App. Sept. 14, 2011), extended to entities beyond those with which the former employee worked, but in upholding that broad prohibition, the court simply said that "[c]ourts have upheld similar provisions prohibiting a former employee from soliciting the employer's customers." But the three cases it cited to support that conclusion all involved agreements or injunctions specifically tailored to limiting the former employee's contact with customers the employee actually serviced or about whom the employee obtained confidential information. *See id.* at *19 (citing *Lockhart v. McCurley*, No. 10-09-00240-CV, 2010 WL 966029, at *2 (Tex. App. Mar. 10, 2010) (upholding injunction that limited former employee from soliciting specific clients of his former employer who he had "served," with whom he had "dealt," or with whom he had "represented or conducted" business related to his former employer); *Totino v. Alexander & Ass., Inc.*, No. 01-97-01204-CV, 1998 WL 552818, at *4 (Tex. App. Aug. 20, 1998) (not designated for publication) ("Here . . . the covenants restrict the individual appellants from soliciting and servicing only those clients with whom they

personally worked."); *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 550-51, 553 (Tex. App. 1993) (upholding injunction preventing former employee "from soliciting or transacting business with IBS's consultants and customers, whose identities she was able to obtain through confidential information" and who were specifically set out in two exhibits, rather than all of the former employer's clients)).

Standing in contrast to the cases on which PrimeSource relies is the weight of Texas case law making it clear that a non-solicitation clause without a reasonable geographic limitation is overly broad if it extends to clients with whom the former employee never interacted. *See, e.g., Rimkus*, 255 F.R.D. at 439; *Wright*, 137 S.W.3d at 298; *John R. Ray & Sons*, 923 S.W.2d at 85; *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387-88 (Tex. 1991). And here, the defendants' agreements prevent them from soliciting not just any PrimeSource customer, but any entity that PrimeSource solicited as a prospective customer in the two years predating their departure. That renders the connection between the prohibition and PrimeSource's legitimate business interests even more tenuous. *See GE Betz*, 2014 WL 12596523, at *9 (noting that non-solicitation agreement's extension to prospective customers was overbroad). Accordingly, the court agrees that the non-solicitation covenant is unreasonably broad as written, and should be reformed to prevent the defendants from soliciting PrimeSource clients with whom they had contact during their employment with PrimeSource.

Even where the non-solicitation agreement is reformed to target only the defendants' former PrimeSource contacts, the court must consider PrimeSource's

argument that the defendants violated the non-solicitation provisions by making lists of the clients they had serviced while at PrimeSource, exchanging the lists, and soliciting contacts from their colleagues' lists. Although this argument hinges largely on the premise that the defendants divulged confidential information in creating those lists, a premise addressed in Section B(3) above, they argue that divulging customer identities violates the non-solicitation covenants even if they simply provide a list of customers and do not solicit those customers themselves. In support of that argument, PrimeSource primarily points to *York v. Hair Club for Men, LLC*, No. 01-09-00024-CV, 2009 WL 1840813, at *5 (Tex. App. June 25, 2009), where the court stated that former employees of a hair replacement company violated their non-solicitation agreements by divulging to their new employer a list of clients they had serviced at their former employer. But the non-solicitation agreement at issue in *York* is distinguishable from the language at issue here, because there the "non-solicitation agreement require[s] the employee not to solicit or *aid in soliciting* any business" from any of their former employer's customers. *Id.* (emphasis added). So arguably under the agreement at issue in *York*, the act of providing their new employer a list of their previous customers aided the new employer's solicitation of those customers. Here, the defendants' non-solicitation agreements say nothing about aiding in solicitation or otherwise address instances of indirect solicitation, so the *York* decision is of limited utility.

Although the court concludes that the non-solicitation agreement may be enforced as reformed to preclude the solicitation of PrimeSource customers with

whom the defendants actually had contact during their tenure at PrimeSource, PrimeSource has not made a persuasive showing that as a blanket matter the defendants are violating the reformed agreements by soliciting PrimeSource clients who they never worked with, but with whom their former PrimeSource colleagues worked. But there are two lines of evidence from which the court concludes that PrimeSource has shown some likelihood of success. First, and most straight-forwardly, Felten and Kottmeyer both admitted that in their early days at Huttig they contacted some of their former PrimeSource customers to solicit business for Huttig. (Tr. 739-40, 742-44, 813-14, 816, 837-38.) Second, there is evidence that after exchanging customer lists, in reaching out to each other's previous PrimeSource contacts, some of the defendants referenced the customer's relationship with the defendant who provided the customer information and tried to leverage that relationship to make a sale. For example, in soliciting one of Sagunsky's PrimeSource contacts, Kessler wrote to a customer specifically referencing her relationship with Sagunsky and Sagunsky's intent that her ordering needs be met. (PX 170.) Similarly, in contacting one of Kessler's PrimeSource customers Sagunsky specifically referenced the contact's relationship with Kessler at PrimeSource to establish credibility with the customer. (PX 223.) That evidence suggests that Kessler and Sagunsky leveraged the customer goodwill they knew their colleague had built with a customer while at PrimeSource to make sales on behalf of Huttig-Grip.[12] That type of customer goodwill represents the kind of

---

[12] Even Fishbein testified that although he "heard rumblings" that the Felten

legitimate business interest that non-solicitation provisions are designed to protect. Thus the court concludes that PrimeSource has shown at least some likelihood of success on the merits of its claims that Felten, Kessler, Kottmeyer, and Sagunsky violated their non-solicitation covenants while working at Huttig-Grip.

### 7.     Tortious Interference with Contracts

Finally, PrimeSource argues that it is likely to succeed on its claims that Huttig tortiously interfered with the Felten Defendants' non-competition, non-solicitation, and non-disclosure agreements with PrimeSource by employing them despite their restrictive covenants, instructing them to create lists of customers they had serviced at PrimeSource, and having them solicit customers their colleagues serviced while at PrimeSource.[13]  "Tortious interference with a contract occurs when someone intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract." *Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 601 (7th Cir. 2001). To prevail on its tortious interference claim PrimeSource must establish: "(1) the existence of a valid and enforceable contract between the plaintiff and another party; (2) that the defendant was aware of the contractual relationship; (3) an intentional and unjustified inducement of a

Defendants had communicated with each other about customers within the switched territories, he "would not permit" that, out of respect for their non-solicitation agreements. (Tr. 1471.)

[13]  PrimeSource also argues that Huttig tortiously interfered with Brad Strosahl's and Samuel Sprague's restrictive covenants, but because those claims fall outside the scope of the current preliminary injunction motions, the court limits its analysis to the claims against the Felten Defendants.

breach of the contract by the defendants; (4) the subsequent breach of the contract by the other party, caused by the defendant's inducement; and (5) damages." *See Williams v. Shell Oil Co.*, 18 F.3d 396, 402 (7th Cir. 1994). To establish the inducement element, PrimeSource must show that Huttig engaged in "some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way." *In re Estate of Albergo*, 656 N.E.2d 97, 103 (Ill. App. Ct. 1995).

PrimeSource argues that Huttig "provided a forum" for the Felten Defendants to disclose its confidential information. (R. 155, Reply at 23.) Merely "providing a forum" for a breach of their non-disclosure agreements is not the kind of active inducement that tortious interference claims are meant to protect against. And although the court has concluded that PrimeSource has shown some likelihood of successfully showing that Kessler, Kottmeyer, and Sagunsky breached their non-disclosure agreements by providing information about customers that goes beyond their identities, PrimeSource has not pointed to any evidence that their supervisors at Huttig asked or induced them to provide anything more than customer's identities in the lists they assembled. (Tr. 911-12, 1468-69.) But again, "PrimeSource is not maintaining that the 'mere identity' of customers is confidential." (R. 155, Pl.'s Reply at 9.) Because PrimeSource has not pointed to evidence that Huttig actively induced Kessler, Kottmeyer, and Sagunsky to include confidential details in their customer lists, it has not shown it is likely to succeed on this aspect of its tortious interference claim.

Turning to the non-solicitation and non-competition provisions as applied to Felten, Kessler, Kottmeyer, and Sagunsky, PrimeSource argues that Huttig actively induced them to breach their non-compete agreements by working for Huttig and their non-solicitation agreements by asking them to contact customers with whom they had worked at PrimeSource. But it has pointed to no evidence that anyone at Huttig persuaded or induced Kottmeyer or Felten to contact their former customers in their first days at PrimeSource, and to the extent it will be able to show that they breached the non-solicitation agreements by leveraging each other's previous customer relationships in contacting potential customers for Huttig, there is little evidence that they did so because Huttig asked them to. By contrast, there is evidence that Huttig actively induced Felten, Kessler, Kottmeyer, and Sagunsky to breach their non-compete agreements. Fishbein testified that after joining Huttig he asked new hires, including the Felten Defendants, if they were subject to non-compete agreements before offering them employment, and admitted that he was aware of the relevant non-compete provisions. (Tr. 1472-73.) And there is evidence that after he began his consultancy with Huttig, Fishbein contacted Whitehead in October 2016 and asked him to let the other Felten Defendants know, without revealing Huttig's identity, that he would soon have a job opportunity to offer them. (PX 261.) Several of the Felten Defendants applied for jobs at Huttig the day the hiring application went live and were hired by the next day. Given those contacts after Fishbein was working for Huttig and the almost instantaneous hiring of several Felten Defendants who Huttig knew were subject to non-compete

provisions, PrimeSource has shown at least some likelihood of success on the merits of this aspect of its tortious interference claim. *See Equis Corp. v. Staubauch Co.*, No. 99 CV 7046, 2000 WL 283982, at *1 (N.D. Ill. Mar. 13, 2000) (noting that allegations that defendant attempted to recruit and recruited company's brokers knowing they were subject to non-competition restrictions supported tortious interference with contracts claim).

## C.    Balance of Harms

Turning to the balancing phase of the preliminary injunction analysis, the court must weigh the balance of harms PrimeSource faces if its requested injunction is wrongfully denied against the harms the defendants face if it is wrongly granted, factoring in whether the public interest outweighs PrimeSource's interests. *See Whitaker*, 858 F.3d at 1044. In conducting this analysis the court uses a sliding scale approach, meaning the greater the likelihood of success on a given claim the less the balance of harms must favor the movant. *Id.* at 1054. "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc.*, 237 F.3d at 896-96 (internal quotation omitted). The court must also analyze the scope of the proposed injunction, bearing in mind that "[s]weeping relief is inappropriate if more focused restrictions will serve." *Lakeview Tech.*, 446 F.3d at 658.

In its primary request for injunctive relief, PrimeSource seeks what it calls a "production injunction," asking this court to enter an order shutting down the entire

Huttig-Grip Division pending a final trial on the merits. That request is wildly out of line with the evidence of wrongdoing that PrimeSource has presented. PrimeSource argues that a production injunction is justified because, according to it, PrimeSource's trade secrets were so central to the formation of the Huttig-Grip Division that it cannot continue to operate without using that information. (R. 152, Pl.'s Mem. at 77.) But the court has concluded that it has very little chance of succeeding on the merits of its trade secrets claims, given its failure to identify with particularity any misappropriated trade secrets and the weak evidence of actual or threatened misappropriation. The harm to Huttig if a production injunction is wrongfully entered pending the outcome of this case is substantial, because hundreds of Huttig employees who have no relation to the claims in this case work within that division. (PX 158; Tr. 311, 329, 394, 1128.) Nothing about the evidence relating to trade secrets or misuse of confidential information suggests that the Huttig-Grip Division is unable to function without exploiting PrimeSource's secrets, and risking the livelihood of hundreds of people is a harm that far outweighs any harm PrimeSource will suffer in the absence of a production injunction. That balance is especially clear because, as described below, a much more tailored injunction can preserve the status quo and protect PrimeSource against any "palpable risks of future injury." *See Lakeview Tech.*, 446 F.3d at 657.

PrimeSource's alternative request seeks a more tailored injunction precluding Huttig from: (1) selling products to the customers who appeared on the Felten Defendants' customer lists; (2) restraining Felten, Kessler, Kottmeyer, or

Sagunsky either from working at Huttig or from working within the Huttig-Grip Division; (3) enjoining David Fishbein, Furio, and Zinman from working within the Huttig-Grip Division; and (4) preventing Huttig from using suppliers that Zinman contacted during her first month at Huttig with whom she had also worked at PrimeSource. (R. 152, Pl.'s Mem. at 78.) Starting with the request for injunctive relief against the Felten Defendants, the court concludes that the balance of harms weighs in favor of a limited injunction precluding Huttig from selling products to the customers who appeared on the initial lists created by Kessler, Kottmeyer, and Sagunsky. As described above, PrimeSource has shown some likelihood of success with respect to its claims that these three defendants breached their non-disclosure agreements by including confidential information in their customer lists. The harm to PrimeSource in potentially having its confidential information exploited for unfair competition outweighs any harm to Huttig in foregoing sales to a relatively small universe of potential customers pending the outcome of this litigation. Moreover, the public interest in protecting confidential information flows in PrimeSource's favor with respect to this request. *See nClosures, Inc.*, 2013 WL 158954, at *4.

Given that PrimeSource has shown some likelihood of success on its claims that Felten, Kessler, Kottmeyer, and Sagunsky breached their non-competition and non-solicitation covenants, the court concludes that the balance of harms weighs in its favor on these claims as well. But the court must tailor the injunction to address that harm. In its reply brief, PrimeSource asserts that were the court to enter a

production injunction it "would have no objection to Huttig employing the Defendants in roles having nothing to do with the sales or procurement of fasteners or other building materials." (R. 155, Pl.'s Reply at 38.) In other words, PrimeSource concedes that the harm it fears does not flow from the Felten Defendants working at Huttig generally, as long as they are not involved in or able to influence Huttig's sales of fasteners or other building materials. The court recognizes that that harm of temporary unemployment to these individual defendants if they were precluded from working at Huttig in any capacity until their non-compete provisions expire is a real and serious one. Balancing the harms, the court concludes Felten, Kessler, Kottmeyer, and Sagunsky should be enjoined from performing work for Huttig that is in any way related to the Huttig-Grip Division or the sale of fasteners or building materials until their non-compete covenants expire, or until a resolution of the merits of this case, whichever comes first.[14] To the extent they remain employed by Huttig in this period, Huttig must establish a firewall to prevent Felten, Kessler, Kottmeyer, or Sagunsky from doing any work related to the Huttig-Grip Division, performing any activities related to the sale of fasteners or other building materials, or having any contact with current or prospective customers.

Turning to PrimeSource's requests for relief against the CEO Defendants, the court finds that the balance of harms weighs against even the more tailored request

---

[14] The non-compete and non-solicitation provisions applicable to Felten, Kessler, and Sagunsky will expire on May 17, 2018, and the same provisions applicable to Kottmeyer will expire on May 18, 2018.

for injunctive relief. With respect to PrimeSource's request to preclude Huttig from using any suppliers that Zinman contacted during her first month at Huttig, based on the evidence presented at the hearing its chances of succeeding on the merits of its trade secrets or breach of non-disclosure claims related to those suppliers is quite low. Given the lack of evidence that Zinman used any confidential information in identifying or reaching out to suppliers with whom she had past relationships, there is no demonstrable harm to PrimeSource in allowing Huttig to continue to work with those suppliers. That is especially true given the abundant evidence that fastener suppliers often simultaneously service multiple competing distributors and rarely if ever enter into exclusive contracts with distributors. In light of that evidence, the harm to Huttig if it is precluded from using certain suppliers outweighs any harm to PrimeSource. And the public interest here weighs in favor of promoting on-going free competition in the building products industry.

Nor has PrimeSource shown that an injunction preventing the CEO Defendants from working within the Huttig-Grip Division pending trial is warranted. As discussed above, given that Fishbein's and Furio's non-solicitation agreements have expired, injunctive relief tailored to prevent harm from claims that they breached those agreements is inappropriate. And because the evidence is so weak with respect to the trade secrets misappropriation and breach of non-disclosure agreements claims against the CEO Defendants, PrimeSource's burden of demonstrating harm is higher. *See Whitaker*, 858 F.3d at 1054. But here, the evidence suggests that the CEO Defendants can carry on with their duties at Huttig

without using PrimeSource's confidential information.  As a point of reference, PrimeSource's current CEO arrived at PrimeSource after sitting out a non-compete agreement he signed with a direct PrimeSource competitor, and despite having served as the CEO of that competitor, he testified that he is able to fill his role at PrimeSource without improperly using his former employer's confidential information.  (Tr. 52, 124, 158-59.)  The hearing evidence suggests that the CEO Defendants can do the same.  And again, the public interest in allowing professionals to pursue their occupation after sitting out a non-competition agreement's term flows in favor of the defendants here.  For all of these reasons, PrimeSource's request for an injunction targeting Fishbein, Furio, or Zinman is denied.

## Conclusion

For the foregoing reasons, this court denies the motion for a production injunction or for injunctive relief preventing David Fishbein, Furio, or Zinman from working for Huttig or preventing Huttig from working with suppliers Zinman contacted on its behalf. The motion is further denied to the extent that it seeks any injunction against Whitehead. The motion is granted to the extent that Huttig is enjoined from selling products to any of the customers identified on the customer lists Kessler, Kottmeyer, and Sagunsky created in their first weeks of employment at Huttig, and Felten, Kessler, Kottmeyer, and Sagunsky are precluded from working within the Huttig-Grip Division, performing any activities related to the sale of fasteners or other building materials, or having any contact with current or prospective customers until their non-competition restrictions expire in May 2018 or until this case is resolved on the merits, whichever occurs sooner.

ENTER:

Young B. Kim
United States Magistrate Judge